# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

---

**VENTURE INDUSTRIES CORPORATION,
VEMCO, INC., PATENT HOLDING
COMPANY, and LARRY J. WINGET,**

       *Plaintiff,*

vs.

**AUTOLIV ASP, INC., AUTOLIV, INC.,
and MORTON INTERNATIONAL, INC.,**

       *Defendants.*

HONORABLE AVERN COHN

CIVIL ACTION NO. 99-75354

*__JURY TRIAL DEMANDED__*

---

PAUL LIEBERMAN     (P16664)
**LIEBERMAN BRADLEY, P.C.**
1471 S. Woodward Avenue, #250
Bloomfield Hills, Michigan 48302
(248) 335-4000

A. SIDNEY KATZ
ROBERT B. BRIESBLATT
**WELSH & KATZ, LTD.**
120 South Riverside Plaza, 22rd Floor
Chicago, Illinois 60606
(312) 655-1500

*Of Counsel For Plaintiffs Pending
Admission Pro Hac Vice*

ROBERT C.J. TUTTLE    (P25222)
JOHN M. HALAN       (P37616)
**BROOKS & KUSHMAN P.C.**
1000 Town Center, 22rd Floor
Southfield, Michigan 48075
(248) 358-4400

---

# FIRST AMENDED COMPLAINT
## __AND JURY DEMAND__

# ORIGINAL

# I.  THE PARTIES

## A.    Plaintiffs

1.      Plaintiff Venture Industries Corporation is a Michigan corporation, having an address at 33662 James J. Pompo Drive, Fraser, Michigan  48026.

2.      Plaintiff Patent Holding Company is a Michigan corporation, having an address at 33662 James J. Pompo Drive, Fraser, Michigan  48026.

3.      Plaintiff VEMCO, INC. is a Michigan corporation, having an address at 33662 James J. Pompo Drive, Fraser, Michigan  48026.

4.      Plaintiff Larry J. Winget does business at 33662 James J. Pompo Drive, Fraser, Michigan  48026.

5.      Plaintiffs Venture Industries Corporation, Patent Holding Company, VEMCO, INC., Larry J. Winget, and controlled subsidiaries of Venture Industries Corporation and/or Patent Holding Company and/or Larry Winget and other entities affiliated with any of them through 20% or more common ownership, are hereinafter referred to as "VENTURE."

## B.    Defendants

6.      Defendant Autoliv ASP, Inc. is, upon information and belief, the successor to the Automotive Safety Products business unit of the original Morton International Corporation (hereinafter referred to as "Morton").

7.      Upon information and belief, on or about May 1, 1997 Autoliv AB, a Swedish company, merged with the Automotive Safety Products business unit of Morton to form Autoliv, Inc.

8.      Upon information and belief, the business operations of the Automotive Safety Products business unit of Morton are carried on by Autoliv ASP, Inc., an operating subsidiary of Autoliv, Inc.

9.      The original Morton International Corporation, Autoliv ASP, Inc. and Autoliv, Inc., together with their controlled subsidiaries and other entities affiliated through 20% or more common ownership, are hereinafter referred to as "the Autoliv Defendants."

10.     Upon information and belief, Autoliv ASP, Inc. is an Indiana corporation, having its principal place of business in Ogden, Utah, and is doing business in Auburn Hills, Michigan.

11.     Upon information and belief, Autoliv ASP, Inc. has appointed as its registered agent for service of process The Corporation Company, 30600 Telegraph Road, Bingham Farms, Michigan 48025.

12.     Upon information and belief, Autoliv, Inc. is a Delaware corporation having regional executive headquarters in Ogden, Utah.

13.     Upon information and belief, Autoliv, Inc. has appointed as its registered agent for service of process The Corporation Company, 30600 Telegraph Road, Bingham Farms, Michigan 48025.

14.     Upon information and belief, the business units of the original Morton International, Inc. *not* merged with Autoliv AB were transferred on or about May 1, 1997 to

-2-

a new company which operates as "Morton International, Inc." (together, Morton, its controlled subsidiaries and other entities affiliated through 20% or more common ownership are hereinafter referred to as Morton II), which is an Indiana corporation with its headquarters at 100 North Riverside Plaza, Chicago, Illinois.

15.    Upon information and belief, Morton II has appointed as its registered agent for service of process The Corporation Company, 30600 Telegraph Road, Bingham Farms, Michigan  48025.

## II.  JURISDICTION

16.    The federal claims pleaded herein arise under the Declaratory Judgment Act and the Federal Patent Act.

17.    Subject matter jurisdiction for the federal claims pleaded herein is conferred upon the Court by 28 U.S.C. §§ 2201 and 2202, and 28 U.S.C. § 1338(a).

18.    The state law claims pleaded herein arise under the laws of the State of Michigan.

19.    The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

20.    The state law claims are so related to the federal claims in this action that they form part of the same case or controversy.

21.     Subject matter jurisdiction for the state law claims pleaded herein is conferred upon the Court under 28 U.S.C. §§ 1332 (diversity jurisdiction) and 1367 (supplemental jurisdiction).

## III.   THE TECHNOLOGY OF MOLDED AIR BAG COVERS

22.     Air bags have been used in increasing numbers by automobile manufacturers as supplemental restraint systems for vehicle occupants.

23.     The driver air bag is housed within the steering wheel and is contained by an air bag cover and the passenger air bag is housed in the dashboard and is also contained by an air bag cover.

24.     An air bag cover, whether containing a driver air bag, a passenger air bag, side impact air bag or otherwise must have predetermined mechanical properties, including controlled tearing and separation of the air bag cover to allow proper deployment of the air bag when actuated.

25.     An air bag cover must also be designed to meet other safety, performance and appearance criteria to be suited for volume production and assembly as part of a supplemental restraint system.

26.     Factors affecting the suitability of an air bag cover design include safety, cost, performance features and developments, manufacturing feasibility, paintability, compatibility with other functions of the vehicle interior (e.g., steering wheel), ease of assembly, serviceability and aesthetics (hereinafter referred to as the "Criteria").

-4-

## IV. BACKGROUND OF VENTURE-MORTON DEALINGS BEFORE AGREEMENTS OF 1995

### A. Morton As A "Tier One" Supplier Of Air Bag Systems

27.    Before December 31, 1995, Morton was, and remains to this day, known in the parlance of the automotive industry as a "tier one" supplier of supplemental restraint systems, *i.e.*, air bag systems.

28.    Before December 31, 1995, Morton had a business unit known as "Morton Automotive Safety Products" which supplied Morton supplemental restraint systems to the automotive industry.

29.    Before December 31, 1995, and at all times relevant to this controversy, upon information and belief, Morton had no in-house engineering experience or manufacturing capability for plastic molded air bag covers.

### B. VENTURE As A Custom Molder Of Air Bag Covers

30.    Before December 31, 1995, VENTURE was, and remains to this day, a custom molder of plastic products, including air bag covers, and as to matters relevant to this lawsuit, is known in automotive parlance as a "tier two" supplier of components for supplemental restraint systems.

31.    Before December 31, 1995, VENTURE had over the years developed a substantial body of proprietary technology in the design, engineering, tooling and secondary operations, testing, manufacturing, finishing, and assembly of custom plastic molded products.

-5-

32.     Before December 31, 1995, VENTURE's proprietary technology included the product field of plastic molded air bag covers.

33.     Before December 31, 1995, VENTURE had undertaken, at their risk and through commitment of their resources, significant research and development in the design, engineering, testing and manufacturing of air bag covers.

34.     Before December 31, 1995, and to this day, VENTURE has pioneered the development of thermoplastic molded air bag covers, which were designed to meet the previously recited Criteria for use in supplemental restraint systems.

## C.     Morton's Solicitation Of VENTURE

35.     In March of 1990, Morton solicited the expertise of VENTURE in designing, developing, and manufacturing air bag covers.

36.     The Morton solicitation of VENTURE is set out in a letter of March 8, 1990 (Exhibit 1) which evidences the following points: (a) Morton was then proposing to use air bag covers with reinforced RIM [reaction injection molded] urethane; (b) Morton was interested in VENTURE's suggestions on how to reduce cost and improve performance; (c) Morton was soliciting suggestions on new materials, processes, or design modifications; (d) Morton enticed VENTURE with the prospect of a joint development effort on projects which offer the greatest return; (e) Morton was attracted to VENTURE's expertise in the area of integrating the horn switch into the air bag cover and sought "as much information as possible about the design"; and (f) Morton had a "great interest in participating with VENTURE in worthwhile cover development efforts."

-6-

37.     At the time of the March 8, 1990 letter, Morton did not possess the engineering and manufacturing expertise and know-how to manufacture a thermoplastic molded and painted air bag cover which would meet the Criteria for acceptance by the automotive industry as part of a supplemental restraint system.

### D.     VENTURE's Newly Developed Air Bag Cover Technologies

38.     Upon inducement by Morton's promises of "joint development efforts" which would be mutually beneficial, VENTURE undertook the work and developed a thermoplastic molded and painted air bag cover which (i) met the Criteria for acceptance by the automotive industry and (ii) realized many developments and cost savings over the pre-existing design of Morton.

39.     The new technology created by VENTURE before December 31, 1995, and thereafter, at its risk and by commitment of its resources included, *inter alia*:  (a) the "seamless" tear seam, which avoids a superimposed seam on the exterior face of the air bag cover; (b) the "snap-on" assembly, which permits a thermoplastic molded air bag cover to be installed and removed by engagement and disengagement, respectively, with integrally-molded flanges; (c) the implementation of a thermoplastic polymer, instead of the more costly reinforced RIM urethane, as the material for the air bag cover; (d) the placement of a decorative applique on the exposed surface of the air bag cover to enhance aesthetics; (e) the integration of a horn switch into the air bag cover; (f) the development of mold tool technology, especially adapted for molding of thermoplastic air bag covers, including gating, manifold,

-7-

venting, and ejectors; (g) the controlled thickness of the cover panel in the area of a membrane switch; (h) the provision of a sensitive backing member for enhancing the actuation of a membrane switch; (i) the design of an injection molding tool specially adapted for molding a snap-on thermoplastic cover; and (j) the development and adaptation of painting techniques for finishing thermoplastic air bag covers (*e.g.*, Santoprene®) to meet adhesion, aesthetic, performance, safety, and functional requirements.

40.     The newly developed air bag cover technology developed by VENTURE: (a) was not known outside of the business of VENTURE; (b) was subject to reasonable safeguards on the secrecy of the information; (c) was valuable to the business of VENTURE; (d) was the product of a substantial amount of effort and money expended by VENTURE in development; (e) could not be properly acquired or duplicated by others without incurring the substantial investment and risk undertaken by VENTURE; and (f) met the Criteria of the original equipment manufacturers in the automotive industry.

41.     This newly developed air bag cover technology qualifies as trade secrets of VENTURE.

E.     **Morton's Business Commitments And VENTURE's Reliance Thereon**

42.     The newly developed air bag cover technology of VENTURE was developed at substantial cost and risk and revealed to Morton in reliance on the representation of Morton that VENTURE would be its principal supplier of air bag covers.

-8-

43.     Such representations by Morton made before December 31, 1995 included a promise that Morton would provide VENTURE with a multi-year purchase order for approximately 10 million air bag covers, in aggregate, through 1997, and award over $25 million dollars in cover business by the 1998 model year.

44.     Before December 31, 1995, in addition to the commitment of VENTURE's resources in research and development, VENTURE also assigned technical personnel, reserved production capacity and procured capital equipment in reliance on Morton's promise to use VENTURE as its principal air bag cover supplier.  Such commitment of resources included, *inter alia*, conversion of a paint line at VEMCO, Inc.'s Grand Blanc plant as a dedicated line for air bag covers.

45.     On August 17, 1994, Mr. Garr Roundy, Morton's Senior Buyer, who had, during that time period, responsibility and authority for procurement of air bag covers, issued a letter to Venture (Exhibit 2) which, *inter alia*:

(a)     thanked VENTURE for its work on the FN-116 cover program;

(b)     recognized VENTURE as Morton's finest supplier;

(c)     promised to recommend a long-term supply agreement to be set up and approved immediately;

(d)     promised an award of over $25 million in new cover business by model year 1998;

(e)     asked VENTURE to commit additional corporate resources to the air bag cover program; and

-9-

       (f)     acknowledged VENTURE as the developer of the following air bag cover features:

       (i)     serviceable and non-serviceable versions of a hidden horn blow switch system;

       (ii)     in-mold decorating and attachment of an applique;

       (iii)     the hidden or seamless tear seam; and

       (iv)     the snap-on or lock-in cover for injection molded cover.

46.     On September 2, 1994, Mr. Roundy sent VENTURE a letter of commendation on its outstanding work on an important air bag cover program. (Exhibit 3.)

47.     In reliance on Morton's commitments, and in a confidential business relationship, Venture disclosed its newly developed air bag cover technology to Morton.

## F.    Morton's Wrongful Disclosure Of VENTURE's Trade Secrets And The Initial Litigation

48.     Upon information and belief, both before and after December 31, 1995, Morton and its successor, the Autoliv Defendants, (a) disclosed the trade secrets of VENTURE, to which they had become privy to in a confidential relationship, to one or more third parties for the purpose of transferring existing air bag cover business and placing new business, and (b) used such trade secrets, without Venture's authorization.

49.     Before December 31, 1995, VENTURE alleged in court pleadings that Morton reneged on the promises and inducements made to VENTURE, and VENTURE filed suit, *Venture Industries Corp. v. Morton International, Inc.*, Civil Action No. 95-CV-71251-

DT.  On the basis of a settlement described below, the civil action was dismissed without prejudice.

50.     VENTURE has and is continuing to be injured by such unauthorized disclosure and use of its trade secrets, and such injury cannot be fully compensable by damages alone and is therefore entitled to injunctive and other relief that this Court determines to be just and equitable.

## V.   THE CONTRACT OF DECEMBER 31, 1995

51.     As of December 31, 1995, VENTURE and Morton settled their dispute by entering into a contract which included:  a settlement agreement (Exhibit 4) (the "Settlement Agreement") and its exhibits, a supply agreement and a cross-license agreement (together, the Settlement Agreement and its exhibits are herein referred to as the "Contract").

52.     The Settlement Agreement together with its exhibits are a single settlement and contract.

53.     A material breach of any part of the Contract entitles the non-breaching party to its remedies.

## VI.   SUCCESSION OF OBLIGATIONS AND LIABILITIES

54.     The Autoliv Defendants comprise the successors through merger of the business of the Automotive Safety Products business unit of the original Morton International, Inc.

55.     The Autoliv Defendants assumed by operation of law the obligations and liabilities assigned in the Contract to the Automotive Safety Products business unit of the original Morton International, Inc.

56.     The original Morton International, Inc. is a contracting party in the Contract.

57.     The re-formation of the original Morton International, Inc. into a new company, now defendant Morton International, Inc. (or "Morton II"), does not discharge or absolve Morton II of obligations and liabilities incurred by the original Morton International, inc., prior to re-formation, including the obligations and liabilities under the Contract.

## VII.   DEFENDANT'S BREACHES OF THE CONTRACT
## OF DECEMBER 31, 1995

58.     Since the execution of the Contract, there have been numerous material breaches of the Contract including, but not limited to:

-12-

(a)     Failing to afford VENTURE an opportunity to quote or meet target prices on all Morton and the Autoliv Defendants' Cover programs outside the United States;

(b)     Failing to afford VENTURE an opportunity to quote or meet target prices on all Morton and the Autoliv Defendants' Cover programs within the United States;

(c)     Morton and the Autoliv Defendants awarding Cover programs to companies which were not established module cover suppliers;

(d)     Morton and the Autoliv Defendants failing to afford VENTURE an opportunity to make a showing  that VENTURE's quotes for various Cover programs were reasonably competitive, taking into account price, terms, quality, ability to meet qualification requirements and delivery dates and other objective factors related to competitiveness with other established module cover suppliers;

(e)     Morton and the Autoliv Defendants failing to afford VENTURE an opportunity to make a showing that VENTURE's prices for various target price Cover programs were nonetheless competitive based on the objective data available; and

(f)     Morton and the Autoliv Defendants failing to pay all royalties due VENTURE.

59.     On August 10, 1999, VENTURE served written notice that the Contract was void, nullified, and terminated as of May 1, 1997.  (Exhibit 5.)

60.     The August 10, 1999 notice detailed numerous breaches of the Contract as grounds for voiding, nullifying, and terminating.

-13-

61.     VENTURE incorporates by reference herein the breaches detailed on pages 2-5 of the August 10, 1999 notice.  (Exhibit 5.)

62.     VENTURE believes additional breaches of the contract have occurred in respect of air bag cover business awarded to other cover suppliers in some or all of the 24 countries where Autoliv, Inc. assembles or purchases air bag systems (Exhibit 6, 2 pages), and that further case investigation and discovery will provide evidentiary support for these allegations.

63.     In compliance with ¶12.3 of the  Supply Agreement, VENTURE has submitted these breaches to END DISPUTE for alternative dispute resolution, but the dispute arising from these breaches remains unresolved, and VENTURE is entitled to commence litigation.

## VIII.   THE PATENT FILINGS

64.     Defendants have filed United States patent applications (hereinafter referred to as the "Patent Filings") on many inventions relating to air bag covers, including those which Morton had duly attributed to VENTURE in the Morton letter of August 17, 1994 from Garr Roundy to Rob Burkhart of VENTURE.  (Exhibit 2.)

65.     Such inventions are based on the work product of VENTURE, constitute trade secrets of VENTURE, and the true and correct inventors of any patentable inventions are one or more VENTURE employees or agents, each subject to a pre-existing duty to assign ownership to their employer.

-14-

66.     Numerous of such Patent Filings by the Autoliv Defendants have now resulted in United States and foreign patents, issued and pending, *viz*:

| PATENT FILINGS | | | | | |
|---|---|---|---|---|---|
| U.S. | Canada | Japan | EPO | Australia | Germany |
| 5,186,490 | 2,078,980 | 5,201,338 | 534,694 | 649,354 | 92,308,546 |
| 5,280,946 | 2,094,587 | -- | 573,145 | 645,456 | 69,305,918 |
| 5,306,040 | 2,114,188 | -- | 615,888 | -- | 69,412,671 |
| 5,314,203 | 2,083,236 | -- | 551,732 | 639,644 | -- |
| 5,338,060 | 2,119,302 | -- | 629,527 | -- | 69,420,193 |
| 5,342,086 | 2,117,133 | -- | 623,493 | -- | 69,416,032 |
| 5,346,249 | 2,101,470 | -- | 582,443 | 9,339,839 | 69,306,331 |
| 5,678,848 | -- | -- | 785,111 | -- | -- |
| 5,741,024 | -- | 10,053,083 | 810,127 | -- | -- |

67.     Upon information and belief, other Patent Filings which disclose and claim air bag products based on inventive contributions of VENTURE employees remain pending before the U.S. Patent and Trademark Office.

68.     All such Patent Filings wrongly name Morton and/or Autoliv personnel, not VENTURE and/or its personnel, as the inventors.

69.     Since at least as early as June 8, 1993, Morton and Autoliv have been on notice that VENTURE and/or its personnel, not Morton or Autoliv personnel, are the true and correct inventors of patentable inventions related to VENTURE's dealings with Morton and its successor Autoliv on air bag cover technology.

70.     The inventors' oaths or declarations accompanying the Morton and/or Autoliv Patent Filings are false.

-15-

71.     The naming of Morton or Autoliv personnel as inventors, and the omission of VENTURE and/or its personnel as inventors in the Patent Filings, is a knowing and material misrepresentation and/or withholding of information from the Patent and Trademark Office, in violation of the duty of candor. 37 C.F.R. § 1.56.

## COUNT ONE - FRAUDULENT INDUCEMENT AND MISREPRESENTATION

72.     Plaintiffs adopt and incorporate by reference the aforestated allegations of the Complaint.

73.     Morton made certain representations to VENTURE to induce them to enter into the Contract.  These representations include, but are not limited to:

(a)     VENTURE would be given the opportunity to quote on all of Morton's (and its successor Autoliv's) worldwide Cover programs with only a very limited exclusion (Supply Agreement, ¶ 2.2(a); Ex. 6, p. 3);

(b)     VENTURE would be awarded such Cover programs in which their quote is reasonably competitive with the quotes received from other established module cover suppliers for the same program (Supply Agreement, ¶ 2.2(b); Ex. 6, p. 3);

(c)     VENTURE would also be awarded Cover programs for which Morton (and its successor Autoliv) establishes a "target" price (rather than accept quotes) if they meet or are under the target price *(Id.)*;

-16-

(d)     VENTURE would be afforded an opportunity to show that their price is competitive in those instances that they do not meet or are not under the target price *(Id.)*; and

(e)     VENTURE would also be awarded Cover programs for which they do not meet or are not under the target price, but for which they are able to show that their price is nonetheless competitive *(Id.)*.

74.     Morton's material representations were made for the purpose of inducing VENTURE to enter into the Contract.

75.     Morton's representations were knowingly false when made.

76.     Morton's false representations were made for the purpose of inducing VENTURE to enter into the Contract.

77.     VENTURE relied upon the representations of Morton in entering into the Contract.

78.     Plaintiffs entered into the Settlement Agreement and its Exhibit A, a Cross License Agreement, and Exhibit B, a Supply Agreement, as of December 31, 1995 as a result of fraud and misrepresentations.

79.     Plaintiffs agreed to forgo a trial on the merits of their claims in *Venture v. Morton International, Inc.*, Civil Action No. 95-CV-71251-DT, based on the promises and representations, now breached, made by defendant.

80.     Justice requires that this Court set aside the previous Dismissal and Settlement Agreement and grant relief from said Contract.

-17-

81.     VENTURE has suffered and are continuing to suffer damages as a result of the false representations.

82.     The Autoliv Defendants are liable to VENTURE for fraud and misrepresentation.

## COUNT TWO - BREACH OF CONTRACT

83.     Plaintiff adopts and incorporates by reference the aforestated allegations of the Complaint.

84.     Defendants have committed numerous breaches of the Contract, including the breaches detailed in pages 2-5 of the August 10, 1999 notice letter.  (Exhibit 5.)

85.     Upon information and belief, Defendants have committed other and further breaches, including breaches related to the air bag cover business awarded to other molders in the 24 countries where the Autoliv Defendants have air bag assembly operations.

86.     Defendants are liable to VENTURE for breach of contract.

## COUNT THREE - TERMINATION AND CANCELLATION OF CONTRACT

87.     Plaintiffs adopt and incorporate by reference the aforestated allegations of the Complaint.

88.     The above-recited breaches of the Contract are material.

-18-

89.    The above-recited breaches of the Contract are so material as to deny and deprive Plaintiff of the basis and benefit of their bargain.

90.    The above-recited breaches of the Contract are such that the Autoliv Defendants have substantially not performed the Contract.

91.    The above-recited breaches of the Contract are of such importance that the Contract would not have been made without the promises so breached.

92.    The above-recited breaches of the Contract are sufficiently egregious to warrant this Court finding the Contract null and void.

93.    As a result, Plaintiffs are entitled to have the Contract terminated and canceled.

94.    Plaintiffs offer to do what is reasonable and necessary to protect the interests of innocent third parties.

## COUNT FOUR - ACCOUNTING

95.    Plaintiffs adopt and incorporate by reference the aforestated allegations of the Complaint.

96.    In accordance with the relationship established with Morton in 1990, the Autoliv Defendants have obtained the benefits of VENTURE's proprietary work product, including confidential information, and are accountable to VENTURE for breach of fiduciary duties resulting from such relationship, including confidentiality.

-19-

97.     In accordance with the Contract, Morton and its successor, Autoliv, agreed for the Autoliv Defendants to take on certain duties and responsibilities which include, but are not limited to:

(a)     Morton and its successor, the Autoliv Defendants, shall give VENTURE the opportunity to quote on all worldwide future Cover programs with only a very limited exclusion;

(b)     When Morton and its successor, the Autoliv Defendants, receive quotes from other established module cover suppliers for the same Cover programs, they shall award such cover programs to VENTURE if VENTURE's quote is reasonably competitive. Morton and its successor, the Autoliv Defendants, have a duty to make such a determination in good faith, taking into account price, terms, quality, ability to meet qualification requirements and delivery dates and other objective factors related to competitiveness;

(c)     When Morton and its successor, the Autoliv Defendants, set a target price, rather than accept quotes, VENTURE will be awarded the cover program if VENTURE meets or is under the target price;

(d)     If VENTURE does not meet or is not under the target price, then Morton and its successor, the Autoliv Defendants, will provide VENTURE with an opportunity to show that its price is nonetheless competitive, based on the objective data available and if VENTURE makes such a showing, it shall be awarded that Cover program; and

(e)      Morton and its successor, the Autoliv Defendants, are to pay royalties to VENTURE for the use of its patents.

98.      Prior to December 31, 1995, Morton violated the terms of its obligations to honor commitments to VENTURE as set forth in this First Amended Complaint. Its successor Autoliv benefitted from said breaches and has the information necessary to determine the amount VENTURE was damaged.

99.      Since entering into the Contract with VENTURE, the Autoliv Defendants have been engaged in many Cover programs where they failed to meet their duties and responsibilities as set forth above.    Breaches by the Autoliv Defendants' duties and responsibilities to Venture include, but are not limited to:

(a)      Failing to afford VENTURE an opportunity to quote or meet target prices on Cover programs outside the United States;

(b)      Failing to afford VENTURE an opportunity to quote or meet target prices on Cover programs within the United States;

(c)      Awarding Cover programs to companies which are not established module cover suppliers;

(d)      Failing to afford VENTURE an opportunity to make a showing that VENTURE's quotes for various Cover programs were reasonably competitive, taking into account price, terms, quality, ability to meet qualification requirements and delivery dates and other objective factors related to competitiveness with other established module cover suppliers;

-21-

(e)     Failing to afford VENTURE an opportunity to make a showing that VENTURE's prices for various target price Cover programs were nonetheless competitive based on the objective data available; and

(f)     Failing to pay all royalties to VENTURE for the use of its patents.

100.    The August 10, 1999 notice letter (Exhibit 5) details on pages 2-5 other and further breaches of the Contract.

101.    VENTURE cannot be expected to determine without further case investigation and discovery the amount of worldwide Cover business conducted by the Autoliv Defendants, the amount of Cover programs that were quoted or target priced, details of the quotes or target prices submitted, the criteria the Autoliv Defendants used to determine if those submitted the quotes or meeting target prices were established module cover suppliers, and the royalties that, upon information and belief, are owed VENTURE.

102.    Plaintiffs are entitled to the above information in accordance with the relationship prior to December 31, 1995 and in accordance with the December 31, 1995 Contract, and justice requires that Autoliv Defendants provide this information which is in its possession and control.

103.    Plaintiffs request that this Court enter its judgment compelling the Autoliv Defendants to prepare at their expense, a true and accurate accounting of all of worldwide and United States Cover programs from March, 1990, to present, including to whom the program was awarded, at what price, whether it was a quote or target price, what

-22-

criteria were used to decide not to award it to VENTURE and the royalties due VENTURE from March of 1990 to December 31, 1995, and from December 31, 1995 to the present.

## COUNT FIVE - CORRECTION OF INVENTORSHIP

104.    VENTURE adopts and incorporates by reference the aforestated allegations of the Complaint.

105.    All United States patents issuing from Patent Filings by the Autoliv Defendants, which disclose and claim the VENTURE inventions, contain (or will contain) errors in inventorship.

106.    If such errors arose without deceptive intention, such errors may be corrected pursuant to 35 U.S.C. §§ 116 (pending applications) and 256 (issued patents) by an order directing the Commissioner of Patents and Trademarks to amend the inventorship of the pending applications, and to issue a Certificate of Correction for the issued patents deleting those persons presently named as inventors and adding the names of the VENTURE personnel who are the true and correct inventors.

107.    Plaintiffs are entitled to such an Order correcting inventorship.

## COUNT SIX - DECLARATORY JUDGMENT
## OF PATENT UNENFORCEABILIY

108.    Plaintiffs adopt and incorporate by reference the aforestated allegations of the Complaint.

109.    Plaintiffs are entitled to a judgment declaring the patents unenforceable against VENTURE if procured by inequitable conduct.

110.    If the errors on the naming of inventors on the Patent Filings were made with an intent to mislead or deceive the Patent and Trademark Office on inventorship, such conduct is in violation of the duty of disclosure, and renders unenforceable the patents issuing from the filings.

111.    There now exists, within the jurisdiction of the Court, a justiciable case of actual controversy for which Plaintiffs request a declaration of their rights and other legal relations relative to the enforceability against VENTURE of patents issuing from the Morton and/or its successor Autoliv Patent Filings.

## COUNT SEVEN - DECLARATORY JUDGMENT OF EQUITABLE LICENSE

112.    Plaintiffs adopt and incorporate by reference the aforestated allegations of the Compliant.

-24-

113. There now exists, within the jurisdiction of the Court, a justiciable case of actual controversy for which plaintiffs request a declaration of their rights and other legal relations relative to an equitable license on the subject matter of the Patent Filings.

114. The subject matter disclosed and claimed in the Patent Filings were designed and developed by VENTURE on its premises and using its capital and labor at VENTURE's cost and risk.

115. Plaintiffs are entitled to a judgment declaring plaintiffs free to make, use, offer to sell, and sell (and authorize others to do the same) the subject matter of the Morton and its successor the Autoliv Defendants' Patent Filings, whether by equitable license, shop rights, or otherwise.

## COUNT EIGHT - DECLARATORY JUDGMENT OF PATENT INFRINGEMENT

116. Plaintiffs adopt and incorporate by reference the aforestated allegations of the Complaint.

117. Any license the Autoliv Defendants had to use the technology claimed in patents licensed by VENTURE in the Cross License Agreement (Exhibit 4 hereto) was voided, nullified, and terminated pursuant to the August 10, 1999 letter. (Exhibit 5.)

118. The following chart lists the numbers and titles of United States patents duly and lawfully issued:

-25-

| U.S. Patent No. | Title |
|---|---|
| Re. 35,031 | Automotive Air Bag Cover Having A Horn Switch Formed Therein |
| 5,465,998 | Air Bag Cover Having A Tear Seam Membrane Switch |
| 5,487,557 | Air Bag Cover Having An Applique Fastened Thereto And Method Of Manufacturing Same |
| 5,498,026 | Air Bag Cover Having A Hidden Break Seam |
| 5,501,485 | Snap-On Air Bag Cover |
| 5,520,412 | Thermoplastic Air Bag Cover Having A Membrane Switch |
| 5,529,336 | Air Bag Cover Having An Applique Fastened Thereto And Method Of Manufacturing Same |
| 5,542,694 | Thermoplastic Air Bag Cover Having A Unitary Multifunctional Domed Switching Module |
| 5,549,323 | Plastic Air Bag Cover Having An Integrated Occupant-Sensing Sensor Module |
| 5,558,364 | Plastic Air Bag Cover Having An Integrated Light Source |
| 5,590,902 | Air Bag Cover Having A Switch Assembly Disposed Therein |
| 5,639,112 | Air Bag Module |
| 5,642,901 | Thermoplastic Air Bag Cover Having A Membrane Switch With Enhanced Activation |
| 5,678,849 | Thermoplastic Air Bag Cover Having A Domed Front Panel And Multifunctional Unitary Switching Module |
| 5,683,101 | Automotive Seat Plastic Air Bag Cover |
| 5,685,561 | Thermoplastic Air Bag Cover Assembly Having A Switch And Method Of Making Same |
| 5,744,210 | Natural Wood-Covered Plastic Part Such As A Vehicle Part And Method Of Manufacturing Same |
| 5,765,864 | Unitary Composite Steering Wheel And Air Bag Cover Assembly And Method Of Making Same |
| 5,776,522 | Air Bag Cover Having A Hidden Tear Seam And Method And Apparatus Of Making Same |
| 5,868,988 | Air Bag Cover Having A Hidden Tear Seam And Method And Apparatus Of Making Same |

| U.S. Patent No. | Title |
|---|---|
| 5,922,368 | Injection Molding Apparatus For Molding Thermoplastic Air Bag Cover |
| 5,979,933 | Air Bag Cover Assembly Including A Switch Fastenable To An Air Bag Housing Assembly |

119.    Plaintiff Patent Holding Company is the owner by assignment of the above patents, including the right to recover for past infringement.

120.    Upon information and belief, formed after a reasonable inquiry in the circumstances, the Autoliv Defendants, without consent of Patent Holding Company, are engaged in activities directed toward making, using, selling, or offering for sale in the United States air bag covers covered by one or more of the claims of one or more of the above patents. Such activities, if carried out, will infringe, directly, by inducement, or contributorily, the above-listed patents. These allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

121.    VENTURE has given notice of termination of the prior license and demanded the Autoliv Defendants cease and desist from using any or all of the patents.

122.    Any infringement by the Autoliv Defendants, already occurring or to occur, has been and will be willful and deliberate.

123.    Patent Holding Company has been and will be irreparably harmed by any such willful infringement.

124.    There now exists, within the jurisdiction of the Court, a justiciable case of actual controversy for which plaintiffs request a declaration of their rights and other legal relations relative to infringement of patents owned by plaintiff Patent Holding Company.

-27-

## COUNT NINE - MISAPPROPRIATION OF TRADE SECRETS

125.    Plaintiffs adopt and incorporate by reference the aforestated allegations of the Complaint.

126.    The Autoliv Defendants have wrongfully taken and used the trade secrets of VENTURE, and their conduct constitutes misappropriation of trade secrets under Michigan law.

127.    The misappropriation includes, without implied limitation, the transfer of such trade secrets to one or more third party supplier(s) for air bag covers, and the filing and prosecution of United States patent applications, which upon issuance disclose such trade secrets.

128.    The Autoliv Defendants are liable to VENTURE for misappropriation of trade secrets.

## COUNT TEN - UNJUST ENRICHMENT

129.    Plaintiffs adopt and incorporate by reference the aforestated allegations of the Complaint.

130.    The Autoliv Defendants have received a benefit from VENTURE by access to and commercialization of the new technology created by VENTURE in development of the thermoplastic molded *and painted* air bag cover, including substantial cost savings

accruing from the conversion of the air bag covers from urethane RIM molding to thermoplastic injection molding.

131.   It is inequitable for the Autoliv Defendants to retain such benefit without accounting to VENTURE.

132.   The Autoliv Defendants are liable to plaintiffs for unjust enrichment.

## COUNT ELEVEN - UNFAIR COMPETITION

133.   Plaintiffs adopt and incorporate by reference the aforestated allegations of the Complaint.

134.   The conduct of the Autoliv Defendants, as pleaded herein, constitutes unfair competition under Michigan law.

135.   The Autoliv Defendants are liable to plaintiffs for unfair competition.

## IX.   DEMAND FOR RELIEF

Plaintiffs request entry of a judgment against the Defendants providing the following relief:

A.   A determination that:  (i) Morton committed fraud in inducing VENTURE to enter into the Contract dated December 31, 1995, (ii) the Autoliv Defendants have received the benefit of said fraud, (iii) VENTURE has been damaged as a result of such fraud, and (iv) Defendants are liable for the damages to VENTURE;

-29-

B.     A determination the Autoliv Defendants have breached the Contract of December 31, 1995, and Defendants are liable to VENTURE for breaches of such Contract;

C.     A determination the Contract is terminated and canceled;

D.     An Order compelling the Autoliv Defendants to prepare at their expense, a true and accurate accounting of all worldwide and United States Cover programs including to whom the program was awarded, at what price, whether it was a quote or target price, what criteria were used to decide not to award it to VENTURE, and the royalties due VENTURE from March, 1990 to December 31, 1995, and from December 31, 1995 to the present;

E.     A determination that the asserted patents have been or will be infringed by the Autoliv Defendants;

F.     An order preliminarily and permanently enjoining patent infringement;

G.     An award of compensatory damages for any patent infringement;

H.     A determination that any infringement has been willful;

I.     An increase in the damages of three times for such willful infringement;

J.     A determination this case is "exceptional," in the sense of 35 U.S.C. § 285;

K.     An award of attorneys' fees and costs under 35 U.S.C. § 285;

L.     A determination that Defendants are liable and accountable to VENTURE for: (i) misappropriation of trade secrets, (ii) unjust enrichment, (iii) misrepresentation, and (iv) unfair competition;

M.     An award of compensatory and exemplary damages against Defendants for all amounts found due and owing based on the actionable conduct pleaded herein;

N.     A declaration that plaintiff are the owners of trade secrets relating to thermoplastic molded air bag covers;

O.     A declaration that VENTURE employees or agents, not Morton and its successor Autoliv or their employees, are the true and correct inventors of the inventive subject matter of the Patent Filings;

P.     An Order directing the Commissioner of Patents and Trademarks to correct the inventorship of United States patents, pending or issued, filed by or issued to Morton and/or its successor Autoliv, covering inventions of VENTURE personnel;

Q.     A determination that the Autoliv Defendants have committed inequitable conduct before the United States Patent and Trademark Office by misrepresenting or withholding the correct inventorship on the Patent Filings, and any such patents issuing therefrom are not enforceable against VENTURE;

R.     A determination that Plaintiffs have an equitable license to practice, and authorize others to practice in connection with VENTURE's business, the inventions of the Morton and/or Autoliv Patent Filings;

-31-

S.      An Order for an equitable accounting to account for all profits and other benefits to date accruing to Autoliv from their inequitable retention and/or use of the trade secrets of VENTURE;

T.      An Order impressing a constructive trust for the benefit of VENTURE on the tangible items of the Autoliv Defendants which embody trade secrets of VENTURE, including mold tools, models, and drawings;

U.      An Order preliminarily and permanently enjoining Autoliv and Morton, their parent corporations, brother corporations, sister corporations, officers, agents, servants, employees, successors, assigns and attorneys, and upon those persons in active concert or participation with them, who receive actual notice of the Order by personal service or otherwise, from further acts of: (1) misappropriation of trade secrets, and (2) unfair competition, and (3) patent infringement;

V.      An Order directing the Autoliv Defendants and Morton and their assigns to assign to VENTURE the entire right, title, and interest in and to all inventions (including patents, issued and pending, in the United States and foreign countries) which either: (i) are based on or derived from VENTURE's trade secrets, or (ii) form the subject of issued or pending patents, patent applications, or applications-in-process, related to injection molded air bag covers having inventive contribution of VENTURE and/or VENTURE's employees or agents; and

W.      Such other relief as may be just and equitable on the proofs.

## X. **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury for all issues so triable.

Respectfully submitted,

*(by RCJ Tuttle with express permission)*

Dated: <u>February 16, 2000</u>

PAUL LIEBERMAN (P 16664)
**LIEBERMAN BRADLEY, P.C.**
Suite 250
1471 South Woodward Avenue
Bloomfield Hills, MI  48302-0556
(248) 335-4000

A. SIDNEY KATZ
ROBERT B. BREISBLATT
**WELSH & KATZ, LTD.**
120 South Riverside Plaza, 22nd Floor
Chicago, Illinois  60606
(312) 655-1500

*Of Counsel For Plaintiffs Pending
Admission Pro Hac Vice*

ROBERT C.J. TUTTLE (P 25222)
JOHN M. HALAN (P 37616)
**BROOKS & KUSHMAN P.C.**
1000 Town Center, 22nd Floor
Southfield, Michigan  48075
(248) 358-4400

-33-

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

# SEE CASE FILE FOR ADDITIONAL DOCUMENTS OR PAGES THAT WERE NOT SCANNED