IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VENTURE INDUSTRIES CORPORATION,
VEMCO, INC., PATENT HOLDING
COMPANY, and LARRY J. WINGET,

       *Plaintiffs,*

 v.

AUTOLIV ASP, INC. and AUTOLIV, INC.,

       *Defendants.*

Civil Action No. 99-75354

Judge Avern Cohn

Magistrate Wallace Capel, Jr.

**JURY TRIAL DEMANDED**

John E. Anding (P30356)
Bridget C. Kehoe (P28196)
Thomas V. Hubbard (P60575)
DREW, COOPER & ANDING
Attorney for Plaintiffs
125 Ottawa Ave., NW
Ledyard Building Suite 300
Grand Rapids, Michigan 49503
(616) 454-8300

A. Sidney Katz
Richard W. McLaren, Jr.
Thomas L. Gemmell
WELSH & KATZ, LTD
Attorneys for Plaintiffs
120 South Riverside Plaza, 22nd Floor
Chicago, Illinois 60606
(312) 655-1500

William Horton (P31567)
COX, HODGMAN & GIARMARCO, PC
Attorney for Defendants
Tenth Floor, Columbia Center
101 W. Big Beaver Road
Troy, Michigan 48084
(248) 457-7000

Jonathan F. Putnam
KIRKLAND & ELLIS
Attorney for Defendants
153 East 53rd Street
New York, New York 10022
(212) 446-4800

## SECOND AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs Venture Industries Corporation, Vemco, Inc., Patent Holding Company, and

Larry J. Winget, through their undersigned attorneys of record, state for their Second

Amended Complaint as follows:

- 1 -



## I.  THE PARTIES

**A.**    **Plaintiffs**

1.     Plaintiff Venture Industries Corporation is a Michigan corporation, having an address at 33662 James J. Pompo Drive, Fraser, Michigan 48026.

2.     Plaintiff Patent Holding Company is a Michigan corporation, having an address at 33662 James J. Pompo Drive, Fraser, Michigan 48026.

3.     Plaintiff VEMCO, INC. is a Michigan corporation, having an address at 33662 James J. Pompo Drive, Fraser, Michigan 48026.

4.     Plaintiff Larry J. Winget does business at 33662 James J. Pompo Drive, Fraser, Michigan 48026.

5.     Plaintiffs Venture Industries Corporation, Patent Holding Company, VEMCO, INC., Larry J. Winget, and controlled subsidiaries of Venture Industries Corporation and/or Patent Holding Company and/or Larry Winget and other entities affiliated with any of them through 20% or more common ownership, are hereinafter referred to as "VENTURE".

**B.**    **Defendants**

6.     Defendant Autoliv, Inc. is a Delaware corporation having its regional executive headquarters in Ogden, Utah.

7.     Autoliv, Inc. was incorporated on October 1, 1996 solely for the purpose of merging one of its wholly-owned subsidiaries, ASP Merger Sub, Inc., with Morton International, Inc.'s Automotive Safety Products Division [State of Delaware Certificate of Incorporation for Autoliv, Inc., Exh 7; Prospectus of Autoliv, Inc., pp. 16, 86 at Docket No. 50, Appendix A].

-2-

8.      From at least February 13, 1997 through April 30, 1997, Autoliv, Inc.'s officers and directors included Fred Musone [State of Delaware Annual Franchise Tax Report for Autoliv, Inc. dated February 13, 1997, Exh 8].

9.      Autoliv, Inc. was not engaged in any business activity prior to the merger and combination described in Autoliv, Inc.'s Prospectus dated March 24, 1997 and the Combination Agreement dated November 25, 1996. [Prospectus, p. 86 "Description of New Autoliv, Inc. – General" at Docket No. 50, Appendix A].

10.     Defendant Autoliv ASP, Inc. is an Indiana corporation, having its principal place of business in Ogden, Utah, and is doing business in Auburn Hills, Michigan, hereinafter "Autoliv ASP."  Autoliv ASP was the name assigned to the corporation which survived the merger of ASP Merger Sub, Inc. and Morton International, Inc.  Also, hereinafter "Morton/Autoliv ASP" refers to Morton after the merger but before its name was changed to Autoliv ASP.

C.      Morton International, Inc.

11.     Morton International, Inc. (hereinafter "Morton"), through its Automotive Safety Products Unit, signed the December 31, 1995 Settlement Agreement, Supply Agreement and Cross License Agreement which are, in part, the subject of this action (hereinafter the "Contract").

12.     Fred Musone, President of the Automotive Safety Products Unit of Morton, was directly involved in negotiating the Contract.  From December 31, 1995 through April 30, 1997 Fred Musone remained President of the Automotive Safety Products Unit of Morton [Morton, Form 10-K dated August 7, 1996, Exh 9].

13.    Pursuant to a Combination Agreement, ASP Merger Sub Inc. on May 1, 1997, was merged with, and into Morton (which retained the assets and liabilities of the original Morton's Automotive Safety Products Unit).

14.    The business units of Morton that were <u>not</u> merged on or about May 1, 1997 (as hereafter described) were transferred to a new company which operates as "Morton International, Inc." (hereinafter "New Morton").

**D.    <u>The Merger</u>**

15.    On October 16, 1996 ASP Merger Sub, Inc. was incorporated in Delaware solely for the purpose of being merged with Morton.

16.    ASP Merger Sub, Inc. was not engaged in any business activity prior to the merger and combination described in Autoliv, Inc.'s Prospectus dated March 24, 1997, and the Combination Agreement dated November 25, 1996 [Combination Agreement, p. A-26 at Docket No. 50, Appendix A]

17.    From at least February 13, 1997 through April 30, 1997, ASP Merger Sub, Inc.'s officers and directors included Fred Musone [State of Delaware Annual Franchise Tax Report for Autoliv, Inc. dated February 13, 1997, Exh 8].

18.    As of November 25, 1996, Autoliv, Inc. owned all of the stock of ASP Merger Sub, Inc. [See Combination Agreement, p. A-26, §6.3(b) at Docket No. 50, Appendix A].

19.    Autoliv, Inc. authorized ASP Merger Sub, Inc. to enter into the Combination Agreement and to merge with Morton [Combination Agreement, p. A-26, Article 6.4 at Docket No. 50, Appendix A].

20.     On November 25, 1996 Autoliv, Inc., ASP Merger Sub, Inc., Morton and Autoliv AB entered into a Combination Agreement setting forth the terms under which Morton would be merged with ASP Merger Sub, Inc. [See Combination Agreement at Docket No. 50, Appendix A].

21.     As of November 25, 1996, and at all times during the due diligence conducted by the parties to the Combination Agreement during October and November, 1996 leading up to November 25, 1996, Autoliv, Inc., ASP Merger Sub, Inc. and Morton shared at least one common officer and/or director, in the person of Fred Musone [See State of Delaware Certificate of Incorporation for Autoliv, Inc. and Franchise Tax Report for Autoliv, Inc., Exh 7 and 8; State of Delaware Certificate of Incorporation and Franchise Tax Report for ASP Merger Sub, Inc., Exh 10; Form 10-K filing of Morton, Exh 9].

22.     During the due diligence conducted by Autoliv, Inc., its agents or affiliates, in furtherance of the combination and merger Autoliv, Inc. had knowledge of the Contract, including the Supply Agreement and Cross License Agreement.

23.     Based upon due diligence it conducted, and pursuant to §8.1 of the Combination Agreement, Autoliv, Inc. along with Morton participated in the preparation of and filed the Prospectus/U. S. Exchange Offer filed with the Securities and Exchange Commission on March 24, 1997 [See Combination Agreement; Prospectus; both at Docket No. 50, Appendix A].

24.     As of March 24, 1997, and at all times between November 25, 1996 and March 24, 1997, Autoliv, Inc., ASP Merger Sub, Inc. and Morton shared at least one common officer and/or director in the person of Fred Musone.

-5-

25.   On May 1, 1997 ASP Merger Sub, Inc. was merged with and into Morton and, as a result, ASP Merger Sub, Inc. ceased to exist and Morton became a subsidiary of Autoliv, Inc. [Prospectus, p. 16; Combination Agreement §1.1; both at Docket No. 50, Appendix A].

26.   Immediately prior to the Effective Date of the merger, as defined at §1.2 of the Combination Agreement, Autoliv, Inc., ASP Merger Sub and Morton shared at least one common officer and/or director, in the person of Fred Musone.

27.   Following the merger, Morton's name was changed to Autoliv ASP, Inc., one of the named Defendants in this action [Prospectus, p. 56 "Effect of The Merger," Docket No. 50, Appendix A].

28.   From and after the Effective Date of the merger, as defined at §1.2 of the Combination Agreement, the officers and directors of ASP Merger Sub, Inc. became the officers and directors of Morton [Combination Agreement, §1.5, Docket No. 50, Appendix A].

29.   From and after the Effective Date of the merger, as defined as §1.2 of the Combination Agreement, up through June 11, 1997, Fred Musone was an officer and/or director of Morton/Autoliv ASP.

30.   On the Effective Date of the merger, as defined at §1.2 of the Combination Agreement, Autoliv, Inc. and Morton/Autoliv ASP shared at least one common officer and/or director in the person of Fred Musone.

## II.  JURISDICTION

31.   The federal claims pleaded herein arise under the Declaratory Judgment Act and the Federal Patent Act.

- 6 -

32.     Subject matter jurisdiction for the federal claims pleaded herein is conferred upon the Court by 28 U.S.C. §§2201 and 2202, and 28 U.S.C. §1338(a).

33.     The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

34.     The common law claims are so related to the federal claims in this action that they form part of the same case or controversy.

35.     Subject matter jurisdiction is also conferred upon the Court pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) and 1367 (supplemental jurisdiction).

### III. THE TECHNOLOGY OF MOLDED AIR BAG COVERS

36.     Automobile manufacturers have been using air bags in increasing numbers as supplemental-restraint systems for vehicle occupants.

37.     The driver air bag is generally housed within the steering wheel and is contained by an air bag cover and the passenger air bag is generally housed in the dashboard and is also contained by an air bag cover.

38.     An air bag cover, whether containing a driver air bag, a passenger air bag, side impact air bag or otherwise must have predetermined mechanical properties, including generally controlled tearing and separation of the air bag cover to allow proper deployment of the air bag when actuated.

39.     An air bag cover generally is also designed to meet other safety, performance and appearance criteria to be suited for volume production and assembly as part of a supplemental restraint system.

-7-

40.     Factors affecting the suitability of an air bag cover design include safety, cost, performance features and developments, manufacturing feasibility, paintability, compatibility with other functions of the vehicle interior (*e.g.*, steering wheel), ease of assembly, serviceability and aesthetics (hereinafter referred to as the "Criteria").

## IV.   VENTURE-MORTON DEALINGS BEFORE 1995 CONTRACTS

### A.     Morton As a "Tier One" Supplier Of Air Bag Systems

41.     Before December 31, 1995, Morton was, and its Automotive Safety Products Unit successor, Autoliv ASP, remains to this day, known in the parlance of the automotive industry as a "tier one" supplier of supplemental restraint systems, *i.e.*, air bag systems.

42.     On, before and after December 31, 1995, Morton had a business unit known as the "Morton Automotive Safety Products" business unit that supplied supplemental restraint systems to the automotive industry.

43.     On, before and after December 31, 1995, and at all times relevant to the patent issues in controversy, upon information and belief, formed after reasonable inquiry in the circumstances, Morton prior to the merger, and Autoliv ASP after the merger, had no in-house engineering experience or manufacturing capability for plastic molded air bag covers. These allegations are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

### B.     Venture as a Custom Molder of Air Bag Covers

44.     On, before and after December 31, 1995, VENTURE was, and remains to this day, a custom molder of plastic products, including air bag covers, and as to matters

- 8 -

relevant to this lawsuit, is known in automotive parlance as a "tier two" supplier of components for supplemental restraint systems.

45. On, before and after December 31, 1995 VENTURE had over the years developed a substantial body of proprietary technology in the design, engineering, tooling and secondary operations, testing, manufacturing, finishing, and assembly of custom plastic molded products.

46. On, before and after December 31, 1995, VENTURE's proprietary technology included the product field of plastic molded air bag covers.

47. On, before and after December 31, 1995, VENTURE had undertaken, at their risk and through commitment of their resources, significant research and development in the design, engineering, testing and manufacturing of air bag covers.

48. On, before and after December 31, 1995, and to this day, VENTURE has pioneered the development of thermoplastic molded air bag covers, which were designed to meet the previously recited Criteria for use in supplemental restraint systems.

C.     **Morton's Solicitation of Venture**

49. In March of 1990, Morton solicited the expertise of VENTURE in designing, developing, and manufacturing air bag covers.

50. The Morton solicitation of VENTURE is set out in a letter of March 8, 1990 (Exh 1 at Docket No. 2) which evidences the following points: (a) Morton was then proposing to use air bag covers with reinforced RIM [reaction injection molded] urethane; (b) Morton was interested in VENTURE's suggestions on how to reduce costs and improve performance; (c) Morton was soliciting suggestions on new materials, processes, or design modifications; (d)

- 9 -

Morton represented to VENTURE the prospect of a joint development effort on projects which offered the greatest return; (e) Morton was attracted to VENTURE's expertise in the area of integrating the horn switch into the air bag cover and sought "as much information as possible about the design"; and (f) Morton had a "great interest in participating with VENTURE in worthwhile cover development efforts."

51.    At the time of the March 8, 1990 letter, Morton did not possess the engineering and manufacturing expertise and know-how to manufacture a thermoplastic molded and painted air bag cover that would meet the Criteria for acceptance by the automotive industry as part of a supplemental restraint system.

D.    Venture's Newly-Developed Air Bag Cover Technologies

52.    Upon inducement by Morton's promises of "joint development efforts" which would be mutually beneficial, VENTURE undertook the work and developed a thermoplastic molded and painted air bag cover which (i) met the Criteria for acceptance by the automotive industry and (ii) realized many developments and cost savings over the pre-existing design used by Morton.

53.    The new technology created by VENTURE before December 31, 1995, and thereafter, at its risk and by commitment of its resources included, *inter alia*: (a) the "hidden" tear seam, which, among other things, avoids a superimposed seam on the exterior face of the air bag cover; (b) the "snap-on" assembly, which, among other things, permits a thermoplastic molded air bag cover to be installed and removed by engagement and disengagement, respectively, with integrally-molded flanges; (c) the implementation of a thermoplastic polymer, instead of, among other things, the more costly reinforced RIM

- 10 -

urethane, as the material for the air bag cover; (d) the placement of a decorative applique on the exposed surface of the air bag cover to enhance aesthetics; (e) the integration of a horn switch into the air bag cover; (f) the development of mold tool technology, especially adapted for molding of thermoplastic air bag covers, including, among other things,  gating, manifold, venting, and ejectors; (g) controlled thickness of the cover panel in the area of a membrane switch; (h) the provision of a sensitive backing member for enhancing the actuation of a membrane switch; (i) the design of an injection molding tool specially adapted for molding a snap-on thermoplastic cover; and (j) the development and adaptation of painting techniques for finishing thermoplastic air bag covers (*e.g.*, "Santoprene") to meet adhesion, aesthetic, performance, safety, and functional requirements.

54.    Except to the extent the new air bag technology was eventually patented, the newly developed air bag cover technology developed by VENTURE:  (a) was either not known outside of the business of VENTURE or was published by VENTURE to a limited number of persons in secrecy and confidence; (b) was subject to reasonable safeguards on the secrecy of the information; (c) was valuable to the business of VENTURE; (d) was the product of a substantial amount of effort and money expended by VENTURE in development;  (e) could not be properly acquired or duplicated by others without incurring the substantial investment and risk undertaken by VENTURE; and (f) met the Criteria of the original equipment manufacturers in the automotive industry.

55.    Many elements of this newly developed air bag cover technology were, and continue to be, trade secrets of VENTURE.

E.    **Morton's Business Commitments and Venture's Reliance Thereon**

56.    The newly developed air bag cover technology of VENTURE was developed at substantial cost and risk and revealed to Morton in reliance on the representation of Morton that VENTURE would be Morton's principal supplier of air bag covers.

57.    Before December 31, 1995, in addition to the commitment of VENTURE's resources in research and development, VENTURE also assigned technical personnel, reserved production capacity and procured capital equipment in reliance on Morton's promise to use VENTURE as its principal air bag cover supplier.  Such commitment of resources included, *inter alia*, conversion of a paint line at VEMCO, Inc.'s Grand Blanc plant as a dedicated line for air bag covers.

58.    On August 17, 1994, Mr. Garr Roundy, Morton's Senior Buyer, who had, during that time period, responsibility and authority for procurement of air bag covers, issued a letter to Venture (Exh 2 at Docket No. 2) which, *inter alia*:

      (a)    thanked VENTURE for its work on the FN-116 cover program;

      (b)    recognized VENTURE as Morton's finest supplier;

      (c)    promised to recommend a long-term supply agreement to be set up and approved immediately;

      (d)    promised an award of over $25 million in new cover business by model year 1998;

      (e)    asked VENTURE to commit additional corporate resources to the air bag cover program; and

      (f)    acknowledged VENTURE as the developer of the following air bag cover features:

- 12 -

      (i)     serviceable and non-serviceable versions of a hidden horn blow switch system;

      (ii)    in-mold decorating and attachment of an applique;

      (iii)   the hidden or seamless tear seam; and

      (iv)   the snap-on or lock-in cover for injection molded cover.

59.    On September 2, 1994, Mr. Roundy sent VENTURE a letter of commendation on its outstanding work on an important air bag cover program (Exh 3 at Docket No. 2).

60.    In reliance on Morton's commitments, and in a confidential business relationship, Venture disclosed its newly developed air bag cover technology to Morton.

F.   **Morton's Wrongful Disclosure of Venture's Trade Secrets and Initial Litigation**

61.    Upon information and belief, formed after reasonable inquiry into the circumstances, both before and after December 31, 1995, Morton and its successors, Defendants, (a) disclosed the trade secrets of VENTURE, to which they had become privy to in a confidential relationship, to one or more third parties for the purpose of transferring existing air bag cover business and placing new business, and (b) used such trade secrets, without VENTURE'S authorization. These allegations are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

62.    Before December 31, 1995, VENTURE alleged in court pleadings that Morton reneged on the promises and inducements made to VENTURE, and VENTURE filed suit, *Venture Industries Corp. v. Morton International, Inc.*, Civil Action No. 95-CV-71251-DT. On the basis of a settlement described below, the civil action was dismissed without prejudice.

63.    VENTURE has and is continuing to be injured by such unauthorized disclosure and use of its trade secrets, and such injury cannot be fully compensated by damages alone

and is therefore entitled to injunctive and other relief that this Court determines to be just and equitable.

## V.   THE DECEMBER 31, 1995 CONTRACT

64.     In an effort to settle the ongoing dispute between VENTURE and Morton as described in Paragraphs 44-63 herein, Fred Musone, President of Morton's Automotive Safety Products business unit initiated negotiations with VENTURE.

65.     The negotiations between Mr. Musone and VENTURE spanned three (3) months and were the basis of the Contract entered into between Morton and VENTURE dated December 31, 1995 (Exh 4 at Docket No. 2).

66.     The Contract consisted of the "Settlement Agreement and Mutual Release," the "Supply Agreement" and the "Cross License Agreement," which together constituted a single contract, hereinafter referred to as the "Contract."

67.     The Contract provided, among other things that:

(a)     Use of the "Subject Technology," as defined in the Contract, by Morton, VENTURE or any third party was conditioned upon the parties abiding by all the terms of the Contract (hereinafter "Subject Technology").

(b)     The Contract was binding on any "Affiliate" of Morton or VENTURE as that term was defined in the Contract.

(c)     One of the pre-conditions to use of the Subject Technology was that VENTURE would be entitled to bid on "all" of Morton's future "worldwide" "Cover Programs," with certain listed exclusions.

(d)     Another pre-condition to use of the Subject Technology was that VENTURE would be entitled to receive any Cover program on which it:  1) was reasonably competitive; 2) met target pricing; and/or 3) could objectively demonstrate its pricing was reasonably competitive.

(e)     Other conditions attached to use of the Subject Technology including the payment of royalties under certain conditions.

- 14 -

A.    The Contract, the Merger and Autoliv, Inc.

68.    Autoliv, Inc. authorized ASP Merger Sub to merge with and into Morton, with the result that Morton would become Autoliv, Inc.'s subsidiary, be renamed Autoliv ASP, Inc. and become vested with all the rights, assets, liabilities and obligations held by Morton prior to the merger [Combination Agreement, §6.4 and §1.3 at Docket No. 50, Appendix A].

69.    Autoliv, Inc. knew prior to the Effective Date of the merger that included among the Morton assets and liabilities which Autoliv ASP would become vested in and subject to was the Contract.

70.    Autoliv, Inc. appraised Morton's right to use the technology [*patented* and *non-patented*] to which Autoliv ASP would become the successor in interest as a result of the merger at $223 Million [Prospectus, p. 93 at Docket No. 50, Appendix A].

71.    Included in the right to use technology to which Autoliv ASP succeeded as a result of the merger was the right to use the Subject Technology described in the Contract.

72.    Autoliv, Inc. knew prior to the Effective Date of the merger that the Subject Technology, the rights to which were described in the Contract, could only be used in accordance with the terms of the Contract.

## VI.  THE SUBJECT TECHNOLOGY AND AUTOLIV, INC.

73.    After the merger Autoliv, Inc. and Autoliv ASP consolidated and coordinated their research and development of air bag technology into jointly controlled facilities located in Stockholm, Sweden; Ogden, Utah; London and/or Amsterdam [Autoliv, Inc. Public Release, Exh 11].

74.     Subsequent to the merger Autoliv, Inc., itself and/or through its subsidiaries, began using the Subject Technology described in the Contract.

75.     Autoliv, Inc.'s use of the Subject Technology covered by the Contract included, but was not limited to, the manufacture and/or sale of air bag covers by one of its German subsidiaries, Autoliv GmbH.

76.     Upon information and belief, formed after reasonable inquiry in the circumstances, Autoliv, Inc. used the Subject Technology covered by the Contract in connection with the manufacture and/or sale of air bag covers through its subsidiaries located in at least nine (9) other countries around the world in addition to the United States and Germany -- Spain, Malaysia, Sweden, Korea, the Netherlands, Japan, France, Austria and Great Britain.  These allegations are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

77.     Autoliv, Inc.'s use of the Subject Technology covered by the Contract was at all times concealed from VENTURE.

78.     Autoliv, Inc. used the Subject Technology covered by the Contract without complying with the terms of the Contract, including those of the Supply Agreement and Cross License Agreement.

## VII.   THE PATENT FILINGS

79.     Morton and Defendants have filed United States patent applications, related foreign patent applications and separate foreign patent applications (hereinafter referred to as the "Patent Filings") on many inventions related to air bag covers that are based on inventive contributions of VENTURE and Venture employees, including those which

- 16 -

Morton had duly attributed to VENTURE in the Morton letter of August 17, 1994 from Garr Roundy to Rob Burkhart of VENTURE (Exh 2 at Docket No. 2).

80.     Upon information and belief, formed after reasonable inquiry in the circumstances, Morton and Defendants themselves or their Affiliates or through their agents and beneficiaries who exploited the VENTURE-Morton relationship and parties to whom any or all of them wrongfully disclosed VENTURE's information have filed and will file other U.S. patent applications, related foreign patent applications and other separate foreign patent applications, subsequent to the date of the original complaint in this action (hereinafter referred to as the "Subsequent Patent Filings"), for inventions related to air bag covers that are based on inventive contributions of VENTURE employees, including those which Morton had duly attributed to VENTURE in the Morton letter of August 17, 1994 from Garr Roundy to Rob Burkhart of VENTURE (Exh 2 at Docket No. 2). These allegations are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

81.     Such inventions are based on the work product of VENTURE, constitute trade secrets of VENTURE, and the true and correct inventors of any patentable inventions are one or more VENTURE employees or agents, each subject to a pre-existing duty to assign ownership to their employer.

82.     Numerous such Patent Filings by Morton and Defendants have now resulted in United States and foreign patents (hereinafter referred to as the "Misidentified Autoliv ASP Patents," issued and pending, *viz*:

- 17 -

| PATENT FILINGS | | | | | |
|---|---|---|---|---|---|
| U.S. | Canada | Japan | EPO | Australia | Germany |
| 5,186,490 | 2,078,980 | 5,201,338 | 534,694 | 649,354 | 92,308,54 |
| 5,280,946 | 2,094,587 | -- | 573,145 | 645,456 | 69,305,91 |
| 5,306,040 | 2,114,188 | -- | 615,888 | -- | 69,412,67 |
| 5,314,203 | 2,083,236 | -- | 551,732 | 639,644 | -- |
| 5,338,060 | 2,119,302 | -- | 629,527 | -- | 69,420,19 |
| 5,342,086 | 2,117,133 | -- | 623,493 | -- | 69,416,03 |
| 5,346,249 | 2,101,470 | -- | 582,443 | 9,339,839 | 69,306,33 |
| 5,369,232 | -- | -- | -- | -- | -- |
| 5,399,819 | -- | -- | -- | -- | -- |
| 5,470,097 | -- | -- | -- | -- | -- |
| 5,678,848 | -- | -- | 785,111 | -- | -- |
| 5,741,024 | -- | 10,053,08 | 810,127 | -- | -- |

83.    Upon information and belief, formed after reasonable inquiry in the circumstances, other Patent Filings and Subsequent Patent Filings, by Morton and Defendants and their Affiliates and by or through all of their agents and beneficiaries who exploited the VENTURE-Morton relationship and parties to whom any or all of them wrongfully disclosed VENTURE'S information, which disclose and claim air bag products based on inventive contributions of VENTURE employees, remain and will be pending before the U.S. Patent and Trademark Office and other foreign patent offices. These allegations are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

84.    All such Patent Filings wrongly name the personnel of Morton and/or Defendants and their Affiliates and/or their agents and beneficiaries who exploited the

VENTURE-Morton relationship and parties to whom any or all of them wrongfully disclosed information, not VENTURE and/or its personnel, as the inventors, and all such Subsequent Patent Filings, upon information and belief, formed after reasonable inquiry in the circumstances, will wrongly name the personnel of Morton and/or Defendants and/or their agents and beneficiaries who exploited the VENTURE-Morton relationship and parties to whom any or all of them wrongfully disclosed information, not VENTURE and/or its personnel as the inventors. These allegations are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

85.     Since at least as early as June 8, 1993, Morton and Defendants have been on notice that VENTURE and/or its personnel, not Morton or Defendants' personnel, are the true and correct inventors of patentable inventions related to VENTURE's dealings with Morton and its successor Autoliv, Inc. on air bag cover technology.

86.     Many of the inventors' oaths or declarations accompanying the Patent Filings, including the Misidentified Autoliv ASP Patents, are false, and the inventor's oaths or declarations accompanying all the Subsequent Patent Filings, upon information and belief, formed after reasonable inquiry in the circumstances, will be false. These allegations are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

87.     The naming of Morton's or Defendants' personnel as inventors, and the omission of VENTURE and/or its personnel as inventors in the Patent Filings and/or Subsequent Patent Filings, is and/or will be, as to many of the representations, a knowing

- 19 -

and material misrepresentation and/or withholding of information from the Patent and Trademark Office, in violation of the duty of candor. 37 C.F.R. § 1.56.

## COUNT I—BREACH OF SUPPLY AGREEMENT—AUTOLIV ASP

88.   Plaintiffs adopt and incorporate by reference the allegations of the preceding paragraphs as though fully set forth herein.

89.   Morton and Autoliv ASP were obligated to VENTURE under the terms of the Contract, including, but not limited to, those obligations set forth in Article 2 of the Supply Agreement.

90.   Morton and Autoliv ASP failed to honor and/or acted arbitrarily in applying the terms of the Supply Agreement, including those set forth in Article 2, by doing or failing to do the following:

(a)   Failing to afford VENTURE an opportunity to quote or meet target prices on all Morton's, Defendants', and their Affiliates' Cover programs within the United States;

(b)   Failing to afford VENTURE an opportunity to quote or meet target prices on all Morton's, Defendants', and their Affiliates' Cover programs outside the United States;

(c)   Awarding Cover programs to companies which were not established module cover suppliers;

(d)   Awarding Cover programs to companies other than VENTURE where VENTURE's quotes on Cover programs were reasonably competitive;

(e)   Failing to afford VENTURE an opportunity to make a showing that VENTURE's quotes for various Cover programs were reasonably competitive, taking into account price, terms, quality, ability to meet qualification requirements and delivery dates and other objective factors related to competitiveness with other established module cover suppliers; and

- 20 -

    (f)    Failing to afford VENTURE an opportunity to make a showing that VENTURE's prices for various target price Cover programs were nonetheless competitive based on the objective data available; and

    (g)    Failing to condition Autoliv, Inc.'s use of the Subject Technology on Autoliv Inc.'s compliance with the terms of the Contract.

91.    Morton and Autoliv ASP's actions, including, but not limited to, those actions detailed above and in the August 10, 1999 notice letter (Exh 5 at Docket No. 2), constituted an anticipatory breach, material breach and/or an "Act of Default" under the Supply Agreement, as well as substantial nonperformance of its obligations under the Contract.

92.    As a direct and proximate result of Morton and Autoliv ASP's breaches of the Supply Agreement, VENTURE has been damaged, suffering substantial economic losses.

93.    Pursuant to § 11.2 of the Supply Agreement, Morton and Autoliv ASP's Act of Default terminated, and/or gave VENTURE the right to terminate the Supply Agreement by written notice.

94.    VENTURE gave written notice it was terminating the Supply Agreement on August 10, 1999.  (Exh 5 at Docket No. 2)

95.    Autoliv ASP failed to cure the Acts of Default set forth in the Notice to Terminate within the time required by the Supply Agreement.

96.    VENTURE is entitled to a declaration that the Supply Agreement is terminated by virtue of Morton and/or Autoliv, Inc.'s anticipatory breach, material breach and/or substantial non-performance as of a date no later than August 10, 1999.

### COUNT II—BREACH OF SUPPLY AGREEMENT-AUTOLIV, INC.

97.    Plaintiffs adopt and incorporate by reference the allegations of the preceding paragraphs as though fully set forth herein.

- 21 -

98.     Prior to the Effective Date of the merger Autoliv, Inc. had knowledge of the Contract, setting forth the conditions under which Morton had rights to use the Subject Technology defined in the Contract.

99.     The Contract included the Supply Agreement which provided, in pertinent part:

Article 15.1

*This Agreement…shall be binding upon the parties respective parents, controlled subsidiaries and other entities affiliated through twenty percent (20%) or more common ownership.*

100.    Autoliv, Inc., with knowledge of the Contract, including Article 15.1 of the Supply Agreement, expressly authorized its subsidiary Autoliv ASP as part of the merger to succeed to the rights and obligations of the Contract, including those in Article 15.1 of the Supply Agreement.

101.    Autoliv, Inc. provided this authorization to Autoliv ASP in order for Autoliv, Inc. to obtain access to the Subject Technology covered by the Contract.

102.    Subsequent to the merger of Morton into Autoliv ASP, Autoliv, Inc. in fact began using the Subject Technology covered by the Contract when it authorized, directed and/or permitted Autoliv, Inc.'s subsidiaries other than Autoliv ASP to incorporate that technology into air bag covers sold by Autoliv, Inc.'s subsidiaries other than Autoliv ASP, including, but not limited to, Autoliv GmbH, a wholly-owned German subsidiary of Autoliv, Inc. operating in Germany.

103.    In using the Subject Technology Autoliv, Inc. accepted the benefits conferred under the Contract.

104.    By virtue of the foregoing, Autoliv, Inc. is bound by the terms of the Supply Agreement because:

(a)    By accepting the benefits of the Contract with knowledge of and assent to its terms, it ratified Autoliv ASP's actions in obligating itself and Autoliv, Inc. to the terms of the Contract by operation of Article 15.1 of the Supply Agreement including the pre-conditions to use of the Subject Technology;

(b)    By accepting and utilizing the benefits conferred by the Contract with knowledge of its terms, it impliedly agreed and assented to be bound by the terms of the Contract, including the pre-conditions to use of the Subject Technology set forth in the Supply Agreement; and/or

(c)    By expressly authorizing Autoliv ASP to succeed to the obligations of the Contract, which included Article 15.1 of the Supply Agreement, by operation of Article 15.1 the Supply Agreement including the pre-conditions to use of the Subject Technology, became binding on Autoliv, Inc.

105.    Autoliv, Inc. failed to honor the terms of the Contract setting forth the pre-conditions to use of the Subject Technology, including Article 2 of the Supply Agreement, by doing or failing to do the following:

(a)    Failing to afford VENTURE an opportunity to quote or meet target prices on all Autoliv, Inc.'s and their Affiliates' Cover programs within the United States;

(b)    Failing to afford VENTURE an opportunity to quote or meet target prices on all Autoliv, Inc.'s and their Affiliates' Cover programs outside the United States;

106.    Autoliv, Inc.'s actions, which were concealed from VENTURE, constituted an anticipatory breach, material breach and/or an "Act of Default" under the Supply Agreement, as well as substantial nonperformance of the Contract.

107.    As a direct and proximate result of Autoliv, Inc.'s breaches of the Supply Agreement, VENTURE has been damaged, suffering substantial economic losses.

108.    Pursuant to section 11.2 of the Supply Agreement, Autoliv, Inc.'s Act of Default terminated, and/or gave VENTURE the right to terminate the Contract, including the Supply Agreement.

109.    VENTURE is entitled to a declaration that the Supply Agreement is terminated by virtue of Autoliv, Inc.'s anticipatory breach, material breach and/or substantial non-performance as of a date no later than August 10, 1999.

## COUNT III—BREACH OF THE CROSS LICENSE AGREEMENT—AUTOLIV ASP

110.    Plaintiffs adopt and incorporate by reference the allegations of the preceding paragraphs as through fully set forth herein.

111.    Morton and Autoliv ASP's anticipatory breach, material breach and/or substantial nonperformance of the Supply Agreement constituted an Act of Default of the Supply Agreement allowing VENTURE to terminate the Supply Agreement on or before August 10, 1999.

112.    Pursuant to Article VII of the Cross License Agreement, the Cross License Agreement terminates upon termination of the Supply Agreement.

113.    Autoliv ASP has denied that Autoliv, Inc. is an "Affiliate" as defined in the Contract (See Cross License Agreement, Recital b; Settlement Agreement and Mutual Release, Recital D).

114.    Without Autoliv ASP paying royalties to VENTURE, Autoliv ASP, their Affiliates, their agents and beneficiaries have continued to wrongfully use the cross licenses originating in the Cross License Agreement after the Cross License Agreement was terminated.

- 24 -

115.    Morton and Autoliv ASP during the period before and after termination of the Cross License Agreement, failed to honor the terms of the Cross License Agreement by doing or failing to do the following:

(a)    By permitting other entities to use the technology covered by the Cross License Agreement, including Autoliv, Inc., without notifying VENTURE;

(b)    By permitting other entities to use technology covered by the Cross License Agreement, including Autoliv, Inc., without obtaining VENTURE's consent;

(c)    By permitting other entities to use the technology covered by the Cross License Agreement, including Autoliv, Inc., without paying VENTURE license fees or royalties; and

(d)    By failing to take necessary and reasonable steps to ensure the confidentiality of the technology covered by the Cross License Agreement.

116.    Morton and Autoliv ASP's wrongful acts constituted an anticipatory breach and/or a material breach of the Cross License Agreement, as well as substantial nonperformance of their obligations under the Cross License Agreement.

117.    As a direct and proximate result of Morton and Autoliv ASP's breaches of the Cross License Agreement, VENTURE has been damaged, suffering substantial economic losses.

118.    The breaches committed by Morton and Autoliv ASP terminated, and/or gave VENTURE the right to terminate the Cross License Agreement as of a date no later than August 10, 1999.

## COUNT IV—BREACH OF CROSS LICENSE AGREEMENT-AUTOLIV, INC.

119.    Plaintiffs adopt and incorporate by reference the allegations of the preceding paragraphs as though fully set forth herein.

120.    Prior to Effective Date of the merger, Autoliv, Inc. had knowledge of the Contract setting forth the conditions under which Morton had rights to use the Subject Technology defined in the Contract.

121.    The Contract included the Cross License Agreement which provided, in pertinent part:

### RECITALS

*B.   This Agreement shall be binding upon and inure to the benefit of the parties and all of their respective controlled subsidiaries and other entities affiliated through twenty percent (20%) or more common ownership (such subsidiaries and affiliated entities are herein referred to as "Affiliates") and such Affiliates shall be included within the terms "Venture" and "Morton."*

122.    Autoliv, Inc., with knowledge of the Contract, including Recital b of the Cross License Agreement, expressly authorized its subsidiary Autoliv ASP as part of the merger to succeed to the rights and obligations of the Contract, including those in Recital b of the Cross License Agreement.

123.    Subsequent to the merger of Morton into Autoliv ASP, Autoliv, Inc. in fact began using the Subject Technology covered by the Contract when it authorized, directed and/or permitted Autoliv, Inc. subsidiaries to incorporate that technology into air bag covers sold by Autoliv, Inc. subsidiaries, including, but not limited to, Autoliv GmbH, a wholly-owned German subsidiary of Autoliv, Inc. operating in Germany.

- 26 -

124. In using the Subject Technology Autoliv, Inc. accepted and retained the benefits conferred under the Contract.

125. By virtue of the foregoing, Autoliv, Inc. is bound by the terms of the Cross License Agreement because:

(a) By accepting and retaining and utilizing the benefits of the Contract with knowledge of and assent to its terms, it ratified Autoliv ASP's actions in obligating itself and Autoliv, Inc. to the terms of the Contract by operation of Recital b of the Cross License Agreement including the pre-conditions to use of the Subject Technology;

(b) By accepting, retaining and utilizing the benefits conferred by the Contract with knowledge of its terms, it impliedly agreed and assented to be bound by the terms of the Contract, including the pre-conditions to use of the Subject Technology set forth in the Cross License Agreement; and/or

(c) By expressly authorizing Autoliv ASP to succeed to the obligations of the Contract, which included Recital b of the Supply Agreement, by operation of Recital b the Cross License Agreement including the pre-conditions to use of the Subject Technology became binding on Autoliv, Inc.

126. Autoliv, Inc. denies that any of its subsidiaries including, but not limited to, Autoliv ASP, Autoliv GmbH, Autoliv Australia Pty. Ltd., Autoliv BKI, S.A, Airbag System SDN BHD, Autoliv Mando Corporation, Autoliv Sverige A3, Autoliv Ltd, Autoliv France SNC, Autoliv Japan Ltd., are "Affiliates" as that term is defined in the Contract (Cross License Agreement, Recital b; Settlement Agreement and Mutual Release, Recital D).

127. Autoliv, Inc. failed to honor the terms of the Contract setting forth the pre-conditions to use of the Subject Technology, including the Cross License Agreement, by doing or failing to do the following:

- 27 -

(a)    By permitting other entities to use the technology covered by the Cross License Agreement, including various of its world-wide subsidiaries, without notifying VENTURE;

(c)    By permitting other entities to use technology covered by the Cross License Agreement, including various of its world-wide subsidiaries, without obtaining VENTURE's consent;

(d)    By permitting other entities to use the technology covered by the Cross License Agreement, including various of its world-wide subsidiaries, without paying VENTURE license fees or royalties; and

(e)    By failing to take necessary and reasonable steps to ensure the confidentiality of the technology covered by the Cross License Agreement.

128.    Autoliv, Inc.'s wrongful acts constituted an anticipatory breach, material breach and/or substantial nonperformance of the Cross License Agreement.

129.    As a direct and proximate result of Autoliv, Inc.'s breaches of the Cross License Agreement, VENTURE has been damaged, suffering substantial economic losses.

130.    The breaches committed by Autoliv, Inc. terminated, and/or entitled VENTURE to terminate the Cross Licensing Agreement as of a date no later than August 10, 1999.

## COUNT V—ABANDONMENT OF SUPPLY AGREEMENT, CROSS LICENSE AGREEMENT AND SETTLEMENT AGREEMENT

131.    Plaintiffs adopt and incorporate by reference the allegations of the preceding paragraphs as though fully set forth herein.

132.    Morton and Defendants, by their breaches of the Contract [described in Count I-IV], manifested a clear and unequivocal intent that they would not abide by the terms of the Contract, specifically the Supply Agreement and Cross License Agreement.

133.    Despite Morton's and Defendant's breaches of the Contract, at all times relevant to the Contract VENTURE stood ready and able to perform the Contract.

134.    However, the breaches of the Contract by Morton and Defendants were so material as to deny and deprive VENTURE of the basis and benefit of their bargain and otherwise defeated the objects of the Contract, specifically the Supply Agreement and Cross License Agreement.

135.    As a result, VENTURE was entitled to abandon the Contract and as such be relieved of any obligations to perform under the Contract, including the Supply Agreement and Cross License Agreement.

136.    VENTURE is entitled to treat the Contract as abandoned, putting an end to the Contract for all purposes of performance, as of the first material breach of Morton and/or Defendants, which shall be no later than August 10, 1999.

137.    VENTURE is also entitled to recover the damages resulting from Morton's and Defendants' use of its technology subject to the Contract, including the losses it suffered because Defendants failed to fully perform under the Supply Agreement and Cross License Agreement.

## COUNT VI—CORRECTION OF INVENTORSHIP
### [Stayed Pending Arbitration]

138.    VENTURE adopts and incorporates by reference the aforestated allegations of the Complaint.

139.    All United States patents issued and issuing from Patent Filings and Subsequent Patent Filings by Defendants, including the Misidentified Autoliv ASP Patents,

which disclose and claim the VENTURE inventions, contain (or will contain) errors in inventorship.

140.   If such errors arose without deceptive intention, such errors may be corrected pursuant to 35 U.S.C. §§ 116 (pending applications) and 256 (issued patents) by an order directing the Commissioner of Patents and Trademarks to amend the inventorship of the pending applications, and to issue a Certificate of Correction for the issued patents deleting those persons presently named as inventors and adding the names of the VENTURE personnel who are the true and correct inventors.

141.   Plaintiffs are entitled to such an Order correcting inventorship. All patents issuing from the Patent Filings and Subsequent Filings, including the Misidentified Autoliv ASP Patents, will lawfully be the property of VENTURE after such Order correcting inventorship is issued.

142.   Upon information and belief, formed after a reasonable inquiry in the circumstances, Morton and Defendants, their Affiliates and beneficiaries who exploited the Morton-Autoliv, Inc. relationship, agents, assignees and licensees, without consent of VENTURE, have been engaged and will continue to engage in activities directed toward making, using, selling, or offering for sale in the United States air bag covers that are covered by one or more of the claims of patents issuing from the Patent Filings and Subsequent Patent Filings, including the Misidentified Autoliv ASP Patents. Morton and Defendants have asserted that Morton and Defendants conceived the inventions claimed in the Patent Filings and Subsequent Patent Filings, including the Misidentified Autoliv ASP Patents, and accordingly VENTURE has been lead to believe by Morton and Defendants that they have

- 30 -

been and are engaged in activities directed toward making, using, selling, or offering for sale in the United States air bag covers covered by one or more of the claims of patents issuing from the Patent Filings and the Subsequent Patent Filings, including the Misidentified Autoliv ASP Patents. Such activities have infringed and, if carried out, will infringe, directly, by inducement, or contributorily, one or more claims of patents issuing from the Patent Filings and Subsequent Patent Filings, including the Misidentified Autoliv ASP Patents, all of which will be the property of VENTURE after such Order correcting inventorship is issued.

143. Such activities have been willful and deliberate.

144. Plaintiffs have been and will continue to be irreparably harmed by such activities.

145. The Cross License Agreement provides for arbitration in certain circumstances.

### COUNT VII—DECLARATORY JUDGMENT OF PATENT UNENFORCEABILITY AGAINST VENTURE
### [Stayed Pending Arbitration]

146. Plaintiffs adopt and incorporate by reference the aforestated allegations of the Complaint.

147. Plaintiffs are entitled to a judgment declaring the Misidentified Autoliv ASP Patents unenforceable against VENTURE.

148. If the errors on the naming of inventors on the Patent Filings were made with an intent to mislead or deceive the Patent and Trademark Office on inventorship, such conduct is in violation of the duty of disclosure, results in Defendants', their affiliates', and beneficiaries' who exploited the VENTURE-Morton relationship, loss of all rights, title and

- 31 -

interests to patents issuing from the Patent Filings, including the Misidentified Autoliv ASP Patents, and renders the patents issuing from the Patent Filings, including the Misidentified Autoliv ASP Patents, unenforceable against VENTURE.

149.    Upon information and belief, formed after reasonable inquiry in the circumstances, all errors on the naming of inventors on the Subsequent Patent Filings will be made with an attempt to mislead or deceive the Patent and Trademark Office on inventorship, such conduct will be in violation of the duty of disclosure, results in Defendants', their affiliates', and beneficiaries', who exploited the VENTURE-Morton relationship, loss of all rights, title and interests to patents issuing from the Subsequent Patent Filings, and will render the patents issuing from the Subsequent Patent Filings unenforceable against VENTURE.  These allegations are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

150.    There now exists, within the jurisdiction of the Court, a justiciable case or actual controversy for which Plaintiffs request a declaration of their rights and other legal relations relative to the enforceability against VENTURE of patents issued and issuing from the Patent Filings and Subsequent Patent Filings, including the Misidentified Autoliv ASP Patents.

## COUNT VIII—DECLARATORY JUDGMENT OF EQUITABLE LICENSE
### [Stayed Pending Arbitration]

151.    Plaintiffs adopt and incorporate by reference the aforestated allegations of the Compliant.

152.    There now exists, within the jurisdiction of the Court, a justiciable case or actual controversy for which plaintiffs request a declaration of their rights and other legal

- 32 -

relations relative to an equitable license on the subject matter of the Patent Filings, Subsequent Patent Filings, and Misidentified Autoliv ASP Patents.

153.   The subject matter disclosed and claimed in the Patent Filings and Misidentified Autoliv ASP Patents was designed and developed by VENTURE on its premises and using its capital and labor at VENTURE's cost and risk.

154.   Upon information and belief, formed after reasonable inquiry in the circumstances, the subject matter that will be disclosed and claimed in the Subsequent Patent Filings was designed and developed by Venture on its premises and using its capital and labor at VENTURE's cost and risk.  These allegations are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

155.   Plaintiffs are entitled to a judgment declaring plaintiffs free to make, use, offer to sell, and sell (and authorize others to do the same) the subject matter of the Patent Filings, Subsequent Patent Filings, and the Misidentified Autoliv ASP Patents, whether by equitable license, shop rights, or otherwise.

## COUNT IX—PATENT INFRINGEMENT
### [Stayed Pending Arbitration]

156.   Plaintiffs adopt and incorporate by reference the aforestated allegations of the Complaint.

157.   Any license Defendants had to use the technology claimed in patents licensed by VENTURE in the Cross License Agreement (Exh 4 at Docket No. 2) was voided, nullified, and terminated pursuant to their abandonment, repudiation, anticipatory breach and/or by the August 10, 1999 letter (Exh 5 at Docket No. 2).

- 33 -

158.    The following chart lists the numbers and titles of United States patents duly

and lawfully issued (hereinafter referred to as the "VENTURE Patents"):

| U.S. Patent No. | Title |
|---|---|
| Re. 35,031 | Automotive Air Bag Cover Having A Horn Switch Formed Therein |
| 5,487,557 | Air Bag Cover Having An Applique Fastened Thereto And Method Of Manufacturing Same |
| 5,498,026 | Air Bag Cover Having A Hidden Break Seam |
| 5,501,485 | Snap-On Air Bag Cover |
| 5,520,412 | Thermoplastic Air Bag Cover Having A Membrane Switch |
| 5,529,336 | Air Bag Cover Having An Applique Fastened Thereto And Method Of Manufacturing Same |
| 5,542,694 | Thermoplastic Air Bag Cover Having A Unitary Multifunctional Domed Switching Module |
| 5,549,323 | Plastic Air Bag Cover Having An Integrated Occupant-Sensing Sensor Module |
| 5,558,364 | Plastic Air Bag Cover Having An Integrated Light Source |
| 5,590,902 | Air Bag Cover Having A Switch Assembly Disposed Therein |
| 5,639,112 | Air Bag Module |
| 5,642,901 | Thermoplastic Air Bag Cover Having A Membrane Switch With Enhanced Activation |
| 5,678,849 | Thermoplastic Air Bag Cover Having A Domed Front Panel And Multifunctional Unitary Switching Module |
| 5,683,101 | Automotive Seat Plastic Air Bag Cover |
| 5,685,561 | Thermoplastic Air Bag Cover Assembly Having A Switch And Method Of Making Same |
| 5,744,210 | Natural Wood-Covered Plastic Part Such As A Vehicle Part And Method Of Manufacturing Same |
| 5,765,864 | Unitary Composite Steering Wheel And Air Bag Cover Assembly And Method Of Making Same |
| 5,776,522 | Air Bag Cover Having A Hidden Tear Seam And Method And Apparatus Of Making Same |

- 34 -

| U.S. Patent No. | Title |
| --- | --- |
| 5,868,988 | Air Bag Cover Having A Hidden Tear Seam And Method And Apparatus Of Making Same |
| 5,922,368 | Injection Molding Apparatus For Molding Thermoplastic Air Bag Cover |
| 5,979,933 | Air Bag Cover Assembly Including A Switch Fastenable To An Air Bag Housing Assembly |

159.    VENTURE is the owner by assignment of the VENTURE patents, including the right to recover for past infringement.

160.    Upon information and belief, formed after a reasonable inquiry in the circumstances, Morton and Defendants, their Affiliates and all of their agents and beneficiaries who exploited the VENTURE-Morton relationship and wrongful licensees, without consent of VENTURE, have been engaged and are engaged in activities directed toward making, using, selling, or offering for sale in the United States air bag covers covered by one or more of the claims of the VENTURE Patents, and patents issuing from the Patent Filings and the Subsequent Patent Filings, including the Misidentified Autoliv ASP Patents. Defendants have asserted to VENTURE that Defendants are licensed under the Cross License Agreement, and accordingly VENTURE has been led to believe by Morton and Defendants that they have been and are engaged in activities directed toward making, using, selling, or offering for sale in the United States air bag covers covered by one or more of the claims of the VENTURE Patents, and patents issuing from the Patent Filings and the Subsequent Patent Filings, including the Misidentified Autoliv ASP Patents. Such activities, if carried out, will infringe, directly, by inducement, or contributorily, the above-listed VENTURE Patents, and/or patents issuing from the Patent Filings and the Subsequent

- 35 -

Patent Filings, including the Misidentified Autoliv ASP Patents. These allegations are likely to have further evidentiary support after a reasonable opportunity for further investigation and discovery.

161.    VENTURE timely gave Morton and Defendants actual notice of the VENTURE Patents, Patent Filings, Subsequent Patent Filings and the Misidentified Autoliv ASP Patents, and from that date have sought from Defendants lists, products and information that would assist VENTURE in confirming whether products made, used, sold, or offered for sale in the United States by Morton and Defendants are within the lawful scope of one or more claims of the VENTURE Patents, and patents issuing from the Patent Filings and the Subsequent Patent Filings, including the Misidentified Autoliv ASP Patents.

162.    Among other reasonable inquires performed under the circumstances, VENTURE purchased scores of air bag covers that may have been made, used, sold, or offered for sale in the United States by Morton and Defendants to determine whether the purchased air bag covers are covered by one or more claims of the VENTURE Patents, and patents issuing from the Patent Filings and Subsequent Patent Filings, including the Misidentified Autoliv ASP Patents. Upon information and belief, formed after reasonable inquiry in the circumstances, air bag manufacturers encode air bags with a secret code that indicates the air bag manufacturer. VENTURE inspected the scores of purchased air bag covers but could not, and still cannot, ascertain which of the purchased air bag covers have been made, used, sold, or offered for sale in the United States by Morton, Defendants and/or their Affiliates. For that reason, VENTURE has sought from Defendants lists of air bag covers that have been made, used, sold, or offered for sale by Morton, Defendants and/or

- 36 -

their Affiliates in the United States and that relate to the VENTURE Patents and/or patents issuing from the Patent Filings and Subsequent Patent Filings, including the Misidentified Autoliv ASP Patents ("Autoliv, Inc.'s Infringing Products"), lists of automobiles in which Autoliv, Inc.'s Infringing Products are incorporated, and actual Autoliv, Inc.'s Infringing Products. Defendants have not provided the sought after lists, products and information. In the absence of such lists, products and information, Plaintiffs resort to the judicial process and the aid of discovery under appropriate judicial safeguards to obtain such lists and information required to confirm the belief that Defendants are engaged in activities that infringe, directly, by inducement, or contributorily, one or more claims of the VENTURE patents, and patents issuing from the Patent Filings and Subsequent Patent Filings, including the Misidentified Autoliv ASP Patents. These allegations are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

163.    Any infringement by Morton and Defendants, already occurring or to occur, has been and will be willful and deliberate, at least on or after August 10, 1999.

164.    VENTURE has been and will be irreparably harmed by any such willful infringement.

## COUNT X—MISAPPROPRIATION OF TRADE SECRETS
### [Stayed Pending Arbitration]

165.    Plaintiffs adopt and incorporate by reference the aforestated allegations of the Complaint.

166.    Defendants have wrongfully taken and used the trade secrets of VENTURE, and their conduct constitutes misappropriation of trade secrets under Michigan law.

- 37 -

167.   The misappropriation includes, without implied limitation, the transfer of such trade secrets to one or more of Defendants' Affiliates, other related parties and/or third-party supplier(s) for air bag covers, and the filing and prosecution of United States patent applications, which upon issuance disclose such trade secrets.

168.   Defendants are liable to VENTURE for misappropriation of trade secrets.

### COUNT XI—UNJUST ENRICHMENT-AUTOLIV, INC.

169.   Plaintiffs adopt and incorporate by reference the allegations of the preceding paragraphs as though fully set forth herein.

170.   Autoliv, Inc. has denied that it is bound by the Contract.

171.   Defendant Autoliv, Inc. has received a benefit from VENTURE by its, its Affiliates and its other related parties' access to and commercialization of the new *non-patented* technology created by VENTURE in development of the thermoplastic molded and painted air bag cover, including:  1) conversion of the air bag covers from urethane RIM molding to thermoplastic injection molding; and 2) development and adaptation of painting techniques for finishing thermoplastic covers to meet adhesion, aesthetic, performance safety and functional requirements, all of which is defined as Subject Technology under the Contract.

172.   Autoliv, Inc. has also received a benefit from VENTURE by its, its Affiliates and its other related parties having access to and commercialization of VENTURE'S *patented* technology, including that patented technology described in the Contract as Subject Technology.

- 38 -

173.     Autoliv, Inc. has received the benefits of using this new technology [*non-patented* and *patented*] created by VENTURE to the detriment of VENTURE, including, but not limited to, its use of that technology which falls within the definition of the Subject Technology contained in the Contract without performing the obligations under the Contract which are a condition precedent to using such technology.

174.     Defendant Autoliv, Inc.'s retention of the economic benefits associated with using VENTURE's technology without accounting to VENTURE is inequitable, unjust and violates principles of good conscience.

175.     Defendant Autoliv, Inc. is liable to Plaintiffs for unjust enrichment.

### COUNT XII—UNJUST ENRICHMENT-AUTOLIV ASP

176.     Plaintiffs adopt and incorporate by reference the allegations of the preceding paragraphs as though fully set forth herein.

177.     Defendant Autoliv ASP has denied that it is bound by the Contract in connection with its use of certain *non-patented* and *patented* technology described at Paragraph 53(a) - (j).

178.     Morton and Autoliv ASP has received a benefit from VENTURE by its, its affiliates and its other related parties' access to and commercialization of the new technology created by VENTURE as described in Paragraph 53(a) - (j) herein.

179.     Morton and Defendant Autoliv ASP have received these benefits to the detriment of VENTURE.

180.    Morton's and Defendant Autoliv ASP's retention of these economic benefits associated with using technology created by VENTURE without accounting to VENTURE, is unequitably unjust and violates principles of good conscience.

181.    Defendant Autoliv ASP is liable to VENTURE for unjust enrichment.

### XIII.  EQUITABLE ACCOUNTING

182.    Plaintiffs adopt and incorporate the damages suffered by reference the aforestated allegations of the Complaint.

183.    The damages suffered by VENTURE as a result of the breaches committed by Morton, Autoliv, Inc. and Autoliv ASP, at law and/or in equity, can be calculated only from documents solely within the control of Autoliv, Inc., Autoliv ASP and its subsidiaries and Affiliates operating in as many as twenty-four (24) countries around the world.

184.    Autoliv, Inc. and Autoliv ASP refused to produce the documents related to air bag cover programs, which upon information and belief, formed after reasonable inquiry in the circumstances, utilize VENTURE technology, that are the subject of Morton and Defendant's breaches, went into production between December 31, 1995 and the present and are the documents from which VENTURE damages can be calculated.  These allegations are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

185.    The Defendants' secreting and/or destruction of documents necessary to calculate VENTURE's damages warrants an equitable accounting of the damages suffered by VENTURE on air bag cover programs that utilized VENTURE technology.

- 40 -

## XIV.  DEMAND FOR RELIEF

Plaintiffs request entry of a judgment against Defendants providing the following relief:

A.    A determination that Morton and Defendants have breached the Contract of December 31, 1995, and Defendants are liable to VENTURE for economic damages arising from breaches of such Contract;

B.    A determination the Contract is terminated, partially rescinded and/or void and nullified as of the date of anticipatory breach, material breach and/or substantial non-performance of the Contract, but in no case later than August 10, 1999;

C.    A determination that the Contract was properly abandoned by VENTURE, as of the date of material breach but no later than August 10, 1999, thereby alleviating any obligation VENTURE may have had under the Contract and terminating any rights Defendants may have under the Contract;

D.    An Order compelling Defendants to prepare at their expense, a true and accurate accounting of all worldwide and United States Cover programs including to whom the program was awarded, at what price, whether it was a quote or target price, what criteria were used by them and their Affiliates to decide not to award it to VENTURE, and the royalties due VENTURE from March, 1990 to December 31, 1995, and from December 31, 1995 to the present;

E.      A determination that the asserted VENTURE Patents have been or will be infringed by Morton and Defendants and the Defendant Affiliate Companies; **[Stayed Pending Arbitration]**

F.      An order enjoining any patent infringement by Defendants and Defendant Affiliate Companies; **[Stayed Pending Arbitration]**

G.      An award of compensatory damages for any patent infringement; **[Stayed Pending Arbitration]**

H.      A determination that any infringement has been willful; **[Stayed Pending Arbitration]**

I.      An increase in the damages of three times for such willful infringement; **[Stayed Pending Arbitration]**

J.      A determination this case is "exceptional", in the sense of 35 U.S.C. § 285; **[Stayed Pending Arbitration]**

K.      An award of attorneys' fees and costs under 35 U.S.C. § 285; **[Stayed Pending Arbitration]**

L.      A determination that Defendants are liable and accountable to VENTURE for: (i) misappropriation of trade secrets **[Stayed Pending Arbitration]**, (ii) unjust enrichment, (iii) misrepresentation, and (iv) unfair competition;

M.      An award of compensatory and exemplary damages against Defendants for all amounts found due and owing based on Defendants' conduct, including restitution;

- 42 -

N.    A declaration that Plaintiffs are the owners of trade secrets relating to thermoplastic molded air bag covers; **[Stayed Pending Arbitration]**

O.    A declaration that VENTURE employees or agents, not Morton, Defendants, or Defendant Affiliate Companies, or any of their employees, are the true and correct inventors of the inventive subject matter of the Patent Filings, the Subsequent Patent Filings, and the Misidentified Autoliv ASP Patents; **[Stayed Pending Arbitration]**;

P.    An Order directing the Commissioner of Patents and Trademarks to correct the inventorship of United States patents, pending or issued, filed by or issued to Defendants or their Affiliates, or any of their agents or wrongful transferees, covering inventions of VENTURE personnel; **[Stayed Pending Arbitration]**

Q.    A declaration that the Misidentified Autoliv ASP Patents are unenforceable against VENTURE; **[Stayed Pending Arbitration]**

R.    A determination that Plaintiffs have an equitable license to practice, and authorize others to practice in connection with VENTURE's business, the inventions of Defendants' Patent Filings and Subsequent Patent Filings; **[Stayed Pending Arbitration]**

S.    An Order for an equitable accounting to account for all profits and other benefits to date accruing to Defendants and the Affiliates from the Patent Filings, Subsequent Patent Filings and the Misidentified Autoliv ASP Patents; **[Stayed Pending Arbitration]**

T.      An Order for an equitable accounting to account for all profits and other benefits to date accruing to Defendants from their inequitable retention and/or use and/or transfer of the trade secrets of VENTURE; **[Stayed Pending Arbitration]**

U.      An Order imposing a constructive trust for the benefit of VENTURE on the tangible items of Defendants, their Affiliates and their wrongful transferees which embody trade secrets of VENTURE, including mold tools, models, and drawings; **[Stayed Pending Arbitration]**

V.      An Order enjoining Defendants, Defendant Affiliate Companies and all of their parent corporations, brother corporations, sister corporations, officers, agents, servants, employees, successors, assigns and attorneys, and upon those persons in active concert or participation with them, who receive actual notice of the Order by personal service or otherwise, from further acts of: (1) misappropriation of trade secrets, **[Stayed Pending Arbitration]** and (2) unfair competition, and (3) patent infringement; **[Stayed Pending Arbitration]**

W.      An Order directing Defendants and their Affiliates and their assigns to assign to VENTURE the entire right, title, and interest in and to all inventions (including patents, issued, pending and to be filed, in the United States and foreign countries) which either: (i) are based on or derived from VENTURE's trade secrets, or (ii) form the subject of issued or pending patents, patent applications, applications-in-process, future patent applications, or future applications-in-process

- 44 -

related to injection molded air bag covers conceived by VENTURE and/or VENTURE's employees or agents; [Stayed Pending Arbitration]

X.    An order has been entered staying pending arbitration Counts VI, VII, VIII and IX along with the related demands for relief set out above; [This Court already has entered this Order] and

Y.    Such other relief as may be just and equitable on the proofs.

## XV.  DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for all issues so triable.

Dated:  January 22, 2003                Respectfully Submitted,


John E. Anding (P30356)
DREW, COOPER & ANDING
Ledyard Building, Suite 300
125 Ottawa Avenue, N.W.
Grand Rapids, MI 49503-2898
(616) 454-8300

A. Sidney Katz
Richard W. McLaren, Jr.
Thomas L. Gemmell
WELSH & KATZ, LTD.
120 South Riverside Plaza, 22nd Floor
Chicago, Illinois  60606
(312) 655-1500

Counsel for Plaintiffs

- 45 -

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

# SEE CASE FILE FOR ADDITIONAL DOCUMENTS OR PAGES THAT WERE NOT SCANNED