UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VENTURE INDUSTRIES CORPORATION,

     Plaintiff,

                                         Case No. 99-75354

v.                                   Hon: AVERN COHN

AUTOLIV ASP, INC.,

     Defendant.

_____/

## DECISION ON
## DENIAL OF DEFENDANT'S MOTION FOR NEW TRIAL

### I. Introduction

This is a commercial dispute.  On December 4, 2003, following a sixteen day trial, a jury found that defendant, Autoliv ASP, Inc. (Autoliv) breached a supply agreement with plaintiff, Venture Industries Corporation (Venture).   The jury awarded Venture $27,576,001.00 as damages.   An Amended Final Judgment in the amount of $33,459,134.84 was entered on April 7, 2004.  A copy of the verdict and final judgment are attached as Exhibits A and B, respectively.  Autoliv appealed the judgment to the Court of Appeals for the Sixth Circuit.  Venture cross-appealed.  For reasons stated in an order filed July 16, 2004, the Sixth Circuit transferred the appeal to the Court of Appeals for the Federal Circuit.  See Venture v. Autoliv, Nos. Nos. 04-1290; 04-1362; 04-1573.

On October 4, 2004, the Court of Appeals for the Federal Circuit stayed the appeal to enable Autoliv to file a motion for a new trial pursuant to Fed. R. Civ. P. 60(b).  On October 21, 2004, Autoliv filed a motion for new trial on liability and damages based on the procedure set forth in First National Bank of Salem Ohio v. Hirsch, 535 F.2d 343 (6th Cir.

1976).  Autoliv seeks a new trial for essentially the following reasons:[1]

> A central issue at trial was Venture's cost to manufacture air
> bag covers and its expected profit margin.  This information
> was also at the heart of Venture's claim that its air bag cover
> quotes were reasonably competitive – the threshold required
> for a successful quote.  Several months after the trial, however,
> Venture publicly admitted that it had falsified its financial books
> and records at Vemco – its Grand Blanc facility and the only
> manufacturing plant at issue in this case... Among other things,
> Venture admitted it had chronically understated its
> manufacturing costs, overstated its profits and that its
> publically-filed financial information "as far back as at least
> 1998 is unreliable and should not be relied upon by investors."
> During discovery, Venture's non-public financial information –
> the data that ultimately disclosed Venture's fraud – was
> concealed from Autoliv.  Despite its efforts, Autoliv was
> required to rely only on the now-admittedly false public filings.

On July 15, 2005, the Court entered an order denying the motion stating that its

reasons would follow.  This decision states the reasons.

## II.  Legal Standards

Fed. R. Civ. P. 60(b) provides in part:

(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud,
Etc. On motion and upon such terms as are just, the court may relieve a party or a
party's legal representative from a final judgment, order, or proceeding for the
following reasons:  (1) mistake, inadvertence, surprise, or excusable neglect; (2)
newly discovered evidence which by due diligence could not have been discovered
in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore
denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an
adverse party ...

Autoliv's motion is based on Fed. R. Civ. P. 60(b)(2) (newly discovered evidence)

---

[1] Consistent with the requirements of <u>First National Bank</u>, the motion states:

> . . .[Defendants]. . .move this Court pursuant to FRCP 60(b) to
> endorse their motion for new trial and enter an order requesting
> that the Federal Circuit remand this case so that the Court may
> grant  Autoliv's  motion  for  new  trial  or  conduct  other
> proceedings related to this motion.

2

and (b)(3) (fraud or other misconduct).  The test for a new trial under (b)(2) is succinctly

stated in <u>Good v. Ohio Edison Co.</u>, 149 F.3d 413, 423 (6th Cir. 1998) as follows:

> In order to prevail on a Rule 60(b)(2) motion, a "movant must demonstrate (1) that it exercised due diligence in obtaining the information and (2) [that] 'the evidence is material and controlling and clearly would have produced a different result if presented before the original judgment.'"... In other words, the evidence cannot be merely impeaching or cumulative.

(citations omitted).

The test for a new trial under (b)(3) is succinctly stated in <u>Jordan v. Paccar, Inc.</u>, 97

F.3d 1452 (table), 1996 WL 528950, ** 8 (6th Cir. Sept. 17, 1996) (unpublished) as follows:

> To summarize, we hold that Rule 60(b)(3) in the Sixth Circuit requires a demonstration by the moving party, supported by clear and convincing evidence, that one or more of the three kinds of misbehavior referred to in the rule occurred [fraud, misrepresentation or misconduct].

### III.  Relevant Background

#### A.

On March 28, 2003, many months before the trial began, Venture filed for

reorganization under Chapter XI of the Bankruptcy Code.  On August 29, 2003 (again

before trial), Venture petitioned the Bankruptcy Court for the appointment of Doeren

Mayhew & Company, P.C., to investigate inter-company, shareholder and related party

transactions.  Doeren Mayhew was formally appointed by the Bankruptcy Court on

November 14, 2003, shortly after the trial began.  However, Doeren Mayhew actually began

its audit efforts on August 27, 2003.  The petition and appointment were matters of public

record.

On March 10, 2004, while the appeal in this case was pending, Doeren Mayhew filed

a written report in which it stated that Venture had suffered multi-million dollar damages as

a result of fraudulent related party transactions.

On March 25, 2004, Doeren Mayhew filed a separate report which it styled:

Preliminary Investigation of Potential Accounting
Irregularities at the Grand Blanc Facility

in which it stated that as a result of accounting irregularities in the inventory and unentered liability accounts at the facility between May, 2003 and December, 2003, the earnings of the facility had been managed by understating accounts payable and overstating inventory. The report was not particularly specific.

On April 5, 2004, Venture filed an SEC Form 8-K stating in part that:

-       Venture entered into a series of related party transactions with its principal stockholder which seriously disadvantaged it, and was seeking to recover in excess of $300 million dollars.

-       It appears that financial information previously publicly reported as far back as at least 1998 was unreliable and should not be relied on by investors.

The Form 8-K also stated that there were apparently accounting irregularities at Venture's Grand Blanc facility which disclosed:

-       an apparent understatement of payables during fiscal year 2003 aggregating $8 to $10 million dollars.

-       an overstatement of inventory during fiscal years 2002 and 2003 in the range of $2.5 to $2.8 million dollars.

The statement regarding the unreliability of the financial information was based on the related party transactions described in the March 10 Doeren Mayhew report.  The statement regarding the Grand Blanc facility accounting irregularities was based on the March 25 Doeren Mayhew report.

4

The Grand Blanc facility would have produced the air bag covers program which were the subject matter of this case. Air bag production represented approximately 33% of the overall production of the Grand Blanc facility.

As a consequence of the Doeren Mayhew reports, Venture made an adjustment to its internal financial statement of its subsidiary, Venco, Inc., which operated the Grand Blanc facility, of $2.5 million dollars to inventory. Of this amount, $888,000.00 consisted of non-air bag inventory which had no effect on the cost of sales related to air bag covers. Of the $1.6 million dollar balance, approximately 25% could be attributed to the cost of sales of air bag cover products.[2]

### IV. Autoliv's Motion under Fed. R. Civ. P. 60(b)(3)

### A.

As to the (b)(3) grounds of the motion, Autoliv argues discovery misconduct, namely that Venture concealed internal financial data and the names of knowledgeable witnesses, the disclosure of which would have had an affect on the outcome of the jury's award of damages.

Because of the contentious nature of discovery on unrelated issues, on March 5, 2002, the Court appointed a special master to deal with discovery matters. The special master during pre-trial filed six reports and recommendations, and according to his records held sixteen meetings with the parties.

Autoliv made discovery requests for internal financial data in the form of written interrogatories on November 11, 2002 and December 18, 2002. When Autoliv deemed the information it received unsatisfactory, it filed a motion to compel on January 27, 2003. The

---

[2] These figures are taken from the affidavit of Thomas McHugh, Venture's controller, filed November 10, 2004.

motion was referred to the special master.

The special master filed a report and recommendation on March 10, 2003. In the report the special master stated in part:

> Document Requests 2-8
>
> Request 2 seeks "each and every one of Venture's monthly quarterly and annual internal and external financial statements for the years 1995 to the present. . .including your general ledgers, subsidiary ledgers, accounts payable and receivable ledgers, trial balances, accountant's work papers, bank statements, check registers and bank records." The answer states that the interrogatory lacks foundation because defendants have never contended that plaintiff's financial condition was the basis of withholding the award of any program. The other document requests seek additional financial information concerning the relationship between Venture and Peguform GmbH. The objection is the same. Requests for financial information in this lawsuit are appropriate, but these requests are overbroad.

Autoliv did not take exception to the recommendation of the special master that discovery of financial information be limited.

As to the assertion that Autoliv was wrongfully denied the opportunity to depose employees of Venture in discovery, particularly Peter Asvestas, controller at the Grand Blanc facility, and the person who manipulated its financial records according to the March 24 Doeren Mayhew report, the record shows the following:

On April 9, 2003 Autolliv filed a motion styled Defendants' Motion to Compel the Rule 30(B)(6) Deposition of Plaintiff Venture Industries' Corporation, Vemco, Inc. and Patent Holding Company. Venture opposed the motion. The Court held a hearing on the motion as well as eleven discovery motions of Venture on September 23, 2003, at which it ruled from the bench as follows:

> All of its financial statements, its annual statements and its quarterly statements and its monthly statements should be

6

produced, and that will show its financial condition. ....

Second, the basis for your contention that Venture's bid on each would have been reasonably competitive with those quotes submitted by others, et cetera. That's actually asking for Venture's position in the litigation. I prefer to wait until the final pretrial statement is prepared and we see which witnesses Venture is going to offer and the nature of their testimony and which exhibits it's going to offer and then if there's some basis for asking that because you don't already have that, that's okay, but that's really part of Venture's proofs. . .once the witnesses are listed, discovery is closed, and each witness is supposed to have a short statement as to what the witness will testify and all of the exhibits are to be listed and documented. . .the joint pretrial statement calls for Venture's position on its proofs so we're going to wait on that.

The Court followed up its bench ruling with an order the same day which read in part as follows:

. . .The Court made a ruling from the bench on each motion. These rulings stand as the order on each motion.

. . .If there is any confusion about a ruling, the Court shall be notified promptly.

There was no follow-up on the Court's ruling by Venture prior to trial. Importantly, Autoliv never identified by name any employee of Venture whose deposition it wanted to take.

**B.**

A careful review of the pre-trial efforts of Autoliv to obtain financial information regarding Venture's operations as well as the names of knowledgeable Venture employees satisfies the Court that Venture cannot be charged with discovery misconduct. Autoliv had ample opportunity to ask the Court to require further of Venture if it felt that its discovery requests was not being met. Indeed, most of the difficulties in discovery related to Venture's efforts to obtain financial information from Autoliv, particularly with regard to the

7

air bag programs it bid on and were not awarded, and the air bag programs it claimed a right to bid on and were not given the opportunity to do so. Additionally, there is no evidence that Venture was aware of the accounts payable understatement or inventory overstatement that Doeren Mayhew describes, albeit in a preliminary fashion in its March 25 report.

Based on the record, Autoliv has not come close to establishing a likelihood that fraud, misrepresentation or misconduct occurred pre-trial that would cause the Court to consider a further evidentiary hearing on its (b)(3) claim or granting a new trial on damages.[3]

## V. Autoliv's Motion under Fed. R. Civ. P. 60(b)(2)

### A.

Autoliv's (b)(2) motion is predicated on the assertion that the Doeren Mayhew reports are newly discovered evidence which, by due diligence, it could not have known in time to move for a new trial within the ten day window offered by Fed. R. Civ. P. 59(b), and that their production would have produced a different result had it been known before trial. Since the 8-K filing was based solely on the Doeren Mayhew reports, it is the reports, and particularly the March 25 report, which is the predicate for the motion.

The Court will assume, contrary to Venture's position, that the March 25 Doeren Mayhew report is new evidence, and will therefore review the damages evidence at trial in light of the report to decide whether or not a different result would have obtained had Venture or Autoliv known of it before trial. The best way to do this is to review the

---

[3] While Autoliv asks for a new trial both on liability and damages, there is nothing in its papers to suggest that Venture's liability case was infected by the matters described in the Doeren Mayhew reports or the 8-K filing.

8

testimony of Aron Levko, Venture's damages witness at trial, and the exhibits offered in evidence during the course of his testimony, particularly Px 167 and its subparts, in light of the March 25 Doeren Mayhew report, as well as the testimony of Glen Sheets, Autoliv's damages witness.

### B.

At the initial oral argument on Autoliv's motion, because of its dissatisfaction with the record as it then stood, affidavit versus affidavit, the Court directed that an evidentiary hearing be held at which Levko could be questioned after he familiarized himself with the March 25 Doeren Mayhew report so the Court could determine how, if at all, the report affected his trial evidence.   The hearing took place on April 29, 2005.   Levko was extensively examined and cross-examined.   What follows is a synopsis of his testimony.

### 1.

During direct examination, Levko stated he reviewed each of the Doeren Mayhew reports.   Nothing he read in the reports has an impact on his opinion and conclusions at trial, except possibly the credit he gave Autoliv for the sales commission charges of $3 million dollars (Px 167-B).   In fact, had he excluded the sales commission charges, his damages estimate would have been $37 million dollars rather than the $34.7 million dollars reflected in Px 167-I.

Particularly, Levko said that he did not base his opinion on either Venture's overall financial statements or the Grand Blanc facility plant-wide financial statements.   Rather, his opinion was based on bids or imputed bids in light of the financial data he reviewed through December 31, 2001.   The financial data consisted of the bids and the actual cost data of production costs for air bag covers particularly for the 1992-1997 period and 1998, as

reflected in two separate studies. This data was specific and reliable. Levko drew a time limit of December 31, 2001 for his analyses. The programs in the studies showed a 30% contribution margin to which Levko added certain production costs not reflected in the studies which reduced the profit margin to 24%. This is the figure Levko used.

For the most part Levko, said that the March 25 Doeren Mayhew report was not specific to the Grand Blanc facility or air bag cover programs. Levko said that none of his calculations were connected to the financial statements of Venture. Levko concluded his direct testimony as follows:

> Q:    Is it fair to say, Mr. Levko, that the changes to plant-wide financial information or company-wide financial information of Venture Industries or Venture's holdings company did not impact your analysis of raw data and raw studies related specific to air bag covers?
>
> A:    They did not.

(Hearing Tr. at p.25).

**2.**

During cross-examination, Levko stated that his analysis of the damages suffered by Venture as a consequence of Autoliv's breach related to the lost contribution margin suffered by Venture. This is the amount of profit Venture would have made had it received orders for the covers from Autoliv which the jury found it was entitled to under the contract. This profit was arrived at by taking into account Venture's fixed costs which would have been covered by the amounts for the covers paid by Autoliv, plus, as Levko put it, and to "pay dividends." To compile the lost contribution margin the variable costs that would be attributed to the not awarded air bag programs must be determined and separated from the fixed costs that would have been incurred in any event. Levko did this based on the 1996 to 2003 internal income statements of the Grand Blanc facility. The variable costs included

10

material costs, allowances for scrap, labor and variable burden.  The scrap rates were determined from specific data on air bag programs and from scrap rates in the plant-wide financial statements.  He used plant-wide financials for the period 1996 to June 30, 2003 to determine variable labor and burden costs, and he used the studies to test his computations.

Levko concluded his cross-examination as follows:

Q:    If you were asked to testify again today, if we had the trial right now, all things you know from the Doeren Mayhew report that we know and otherwise, you would have to change the testimony you gave on Page 1284,[4] wouldn't you?

A:    No.  As I indicated, the basis of the financial statements, the way I relied on

---

[4]  The trial testimony referenced at p. 1284 went as follows:

Q:    And when you talk about total plant wide actual experience, what sort of data or information were you analyzing to arrive at total plant wide variable burden?

A:    I had income statements from the facility year by year.  I took a look at all those income statements over the period that – at issue here, 1996 through 2003 and was able to identify what the labor, the variable burden and fixed burden was.

Q:    And the financial statements you reviewed, were those audited financial statements?

A:    Yes, an outside auditing firm, Deloitte Touche, not our firm, but in all those years never issued any qualified opinion.  They never had any – caused any exception to what was reported.

Q:    Now, in terms of financial information that you were looking at, if it's audited financial information how does that impact its reliability from your perspective?

A:    Well, it tells me what's being reported is fair, also it's – the internal controls are appropriate and adequate and that a third party, an independent party is viewing this information and providing an opinion about its fairness.

Q:    And from your perspective, was that something that enhanced your ability to rely on it?

A:    Yes, it's something I can rely on.  I'm not auditing these results, I'm looking at this – these business records and financial statements that the company produces, and another firm as part of their job reviews the fairness of these documents.

(Trial Tr. at pp. 1283-85).

them, the way I used them, the way I used them in my conclusions is to first test for the material scrap rate, and if I took the inventory adjustment of 2.8 million in 2002, added it in, considered it all scrap, it still would make the scrap rate below the 15% rate that I used so it wouldn't change my conclusion.

THE COURT: Well, that wasn't the question that was asked you. If you were testifying today in light of everything that has occurred, you couldn't say that the certified statements were accurate, could you?

THE WITNESS: I couldn't say the certified statements were accurate, but it wouldn't change my conclusions.

THE COURT: Okay, but you couldn't say the certified statements were accurate, right?

THE WITNESS: I couldn't say.

THE COURT: You would have to explain why you didn't rely on the certified statements or the fact that they were not accurate did not affect your testimony?

THE WITNESS: Yes. I would have to take all of these adjustments into account and then reflect.

(Trial Tr. at pp. 76-77).

### 3.

During re-direct, Levko explained that he started his damages analysis with the bids. These gave him specific product costs. He used the financial statements to identify the ratio between fixed and variable costs as to labor and burden. Autoliv acknowledged at trial the correctness of this use of the financial statements. Any change in the financial statements as a consequence of the Doeren Mayhew reports did not affect the allocation. One of the elements of cost was the scrap rate for air bag cover materials. Levko used 15%. There was a scrap rate element in the bids. Levko had available to him 1996 and 1997 air bag scrap rate percentages. These rates were around 10% to 11%.

Levko also looked at plant-wide scrap rates for the period 1996 though June 30,

2003 as a test.  These showed 12.4%.  The March 25 Doeren Mayhew report called for an inventory adjustment for December 31, 2002 of $2.8 million dollars, and December 31, 2003 of $2.5 million dollars.  If an adjustment is made for these discrepancies of $2.8 million dollars, the plant-wide scrap rate would be 13.4%, still below the 15% rate Levko used.

As to the $8.1 million dollar adjustment to correct the liability account of the Grand Blanc facility, this surfaced in July, 2003, and had no affect on Levko's analysis.  Doeren Mayhew found that Peter Asvestas manipulated the accounts payable account in 2002 and 2003.  Lastly, Levko noted that if the adjustments were made to reflect the irregularities described in the two Doeren Mayhew reports combined, his damages figure would likely have been higher.

**C.**

Levko's testimony at the evidentiary hearing following the filing of Autoliv's motion was consistent with his trial testimony.   A portion of Levko's hearing testimony bears repeating as follows:

BY MR. ANDING (Venture's Attorney):

Q:      This is. . .awkward. . . .I have placed before you the testimony of Glenn Sheets given on November 25th, 2003 in the trial of this matter.  Can you tell us who Glenn Sheets is?

A:      He is the expert for Autoliv in this matter, the damages expert.

Q:      All right.  And I've, the particular page that I have blown up from the trial transcript is Page 2388; do you see that, sir?

A:      Yes, I do.

Q:      Now, Mr. Sheets is being examined here by Mr., Mr. Walsh, and he's asking him about Mr. Sheets' calculation, and Mr. Walsh places a question to him about his calculations, "that – meaning his calculations – as opposed to looking at estimates for parts Venture never

13

manufactured, correct?"

Mr. Sheets says, "That is correct.

"As I mentioned yesterday, there is the universe of the quotes which is a system of its own separate from the financial accounting systems which report up the actual activity that happens in the plant for actual sales, actual materials, labor and other costs of the cost of processing and manufacturing these parts."

Do you see that, sir?

A:    Yes, I do.

Q:    Now, he's talking about Venture's system, correct?

A:    Yes.

Q:    Do you agree with him?

A:    I do.

Q:    Meaning that the bids that you utilized to build your contribution number are separate and independent from the financial statements?

A:    Yes, they are.

Q:    So you agree with Mr. Sheets?

A:    Regarding the quote system, sure.

...

Q:    And I'll begin at Page 2158, Line 17.  Mr. Walsh's question: "Could you tell me whether he – meaning you, Mr. Levko – made any attempt to check those for accuracy to see whether or not they matched Venture's real experience in their income statements?

And let me back up.  Let me start with the question at Line 15. "Could you tell me whether Mr. Levko made any attempt to check the actual numbers that he was using in those estimates?"  And then he repeats the question.  "Could you tell me whether he made an attempt to check those for accuracy to see whether or not they matched Venture's real experience?"

Mr. Sheets asked for a clarification and then responds,

14

"Nothing in the work papers that I reviewed nor in his testimony do I recall him connecting the performance or the results of what was on the income statements that were actually reported by Venture to this cost estimation or, you know, that's what it is, cost estimation system."

Do you see that, sir?

A:   I do.

Q:   Do you agree with Mr. Sheets that you made no attempt in formulating your contribution number to tie that contribution number to the financial statements?

A:   I did, right, in terms of contribution margin.

Q:   All right. You agree with Mr. Sheets?

A:   Yes.

Q:   And just for clarification, instead of attempting to tie your contribution calculations to financial reports to determine what the real contribution margin was, you used studies from 1992 to 1998 peculiar to air bags?

A:   Yes. I used the raw data.

Q:   The raw data?

A:   Yes.

...

Q:   Is it fair to say, Mr. Levko, that the changes to plant-wide financial information or company-wide financial information of Venture Industries or Venture's holdings company did not impact your analysis of raw data and raw studies related specific to air bag covers?

A:   They did not.

MR. ANDING: I have nothing further, Judge.

(Hearing Tr. at pp. 22-25).

### D.

The trial testimony of Autoliv's damages witness at trial, Glenn Sheets, also bears repeating. Sheets agreed that Levko's analysis did not rely on plant-wide financial data.

Sheets testified:

Q:     Could you tell whether Mr. Levko made any attempt to check the
       actual numbers that he was using in those estimates?

       Could you tell whether he made any attempt to check those for
       accuracy, to see whether or not they matched Venture's real
       experience in their income statements?

A:     Did I understand your question to be did he, um, verify the accuracy
       of the income statements, or did he verify that the estimates that he
       used to – to look at the, um, pricing and cost, were those in
       agreement with what was on the, um – the profit and loss statements?

Q:     The latter question.

A:     Okay.

Q:     Yes.

       Did he – did he compare those to the income statements?

A:     Um, nothing in the work papers that I reviewed, nor in his testimony,
       do I recall him connecting the performance or the results of what was
       on the income statements that were actually reported by Venture to
       this cost estimation or, you know, that's what it is, cost estimation
       system.

(Trial Tr. at pp. 2158-59).

....

Q:     (By Mr. Walsh) Let me scoot it over a little bit.  Mr. Sheets, is this a
       redirection of your calculation of the gross profit margin for Venture's
       Grand Blanc facility?

A:     Yes.

       This is a schedule that I prepared that adds the years 1996 through
       – or through 2002.

       I've excluded the year 1998, because there was only a nine-month
       financial statement, and it would be unfair to put a nine month in with
       all of the rest that were annual, or twelve months.  And obviously 2003
       isn't completed yet.

16

(Trial Tr. at p. 2162).

...

Q:      This number right here, 14 percent, that's what you calculated to be
        Venture's manufacturing facilities actual gross profit margin for the
        plant?

A:      Yes.  Looking at the actual profit and loss statements, utilizing the
        same methodology or combinations that Mr. Levko used, the 14
        percent reflects the actual gross profit producing parts at the Grand
        Blanc facility for both air bags and non air bag parts.

Q:      That's, as opposed to looking at estimates for parts Venture never
        manufactured, correct?

A:      That is correct.

        As I mentioned yesterday, there's the universe of the quotes
        which is a system of its own separate from the financial accounting
        systems which report up the actual activity that happens in the plant
        for its actual sales, actual materials, labor and other costs of the cost
        of processing and manufacturing these parts.

Q:      This is a gross number, correct?

A:      Yes.

(Trial Tr. at p. 2388).

## E.

Clearly, Levko's methodology was specific to the past, in determining the profit

Venture would have made on the air bag cover programs which it was not awarded and

which was the subject matter of the damages awarded by the jury because of Autoliv's

breach of the supply agreement.  Sheets' methodology was plant-wide apportioned.  These

differences were summed up by Autoliv in final argument as follows:

        But if for some reason you find that Venture was reasonably
        competitive on a program, and I don't think you will, you should think
        about what Venture's damages are and about what they said versus
        about what we say on these things.

17

You should consider, you can consider, remember basically there was two witnesses that testified about this, Mr. Levko and Glenn Sheets, you can consider either the profit numbers submitted by Glenn Sheets who submitted audited financial statements, or by Mr. Levko, who worked off an internal Venture memorandum with no supporting documentation. Had a memo, no supporting backup. Mr. Sheets testified he used audited financial statements that were submitted to the United States Securities and Exchange Commission under oath.

(Trial Tr. at pp. 2582-83).

### F.

Finally, the bid data used by Levko to form his damages opinion was separate and independent from the Grand Blanc facility plant-wide financial data. This was borne out at trial and confirmed by Levko's testimony at the evidentiary hearing. As a result, Autoliv has not made out a case for a finding that had the accounting irregularities described in the March 25 Doeren Mayhew report been known prior to trial, Levko's opinion and conclusion on damages would have produced a different result at trial with regard as to damages.

### G.

Following the evidentiary hearing, Autoliv, in an attempt to persuade the Court that Levko's use of plant-wide scrap rates as a secondary test of air bag cover scrap rates, a factor in his damages analysis, was not credible in light of the March 25 Doeren Mayhew report finding irregularities in the inventory and accounts receivable accounts, filed the declaration of Kevin F. Dages. Nothing in the opinions expressed by Dages persuade the Court that its decision denying a new trial is incorrect because:

- Levko's analysis did not include a direct relationship between plant-wide financial performance and the air bag quotes he testified to

- Sheets in his testimony at trial gave this failure as the reason for rejecting Levko's analysis

18

- Production costs based on plant-wide financial data does not particularize air bag cover production costs

- Air bag cover products constituted only 33% of the Grand Blanc facility's production

- The absence of air bag cover orders required the Grand Blanc facility to look to less profitable and higher cost products to maintain production

- The accounts payable manipulations took place in July, 2003, subsequent to the financial time period Levko used

- 1/3 of the inventory manipulation related to non-air bag inventory stored in a warehouse outside the Grand Blanc facility, and had nothing to do with air bag covers

- As to the Grand Blanc facility inventory adjustments, only 25% can be attributed to the cost of sales of air bag covers

- Only 44.2% of production costs in the Levko analysis related to material cost.  Scrap rates were a subset of material costs

## VI. Conclusion

### A.

In sum,

- Contrary to Autoliv's assertion in its supplemental memorandum filed May 9, 2005, there can be no dispute that, prior to trial, Autoliv either was or had to be aware of the fact that Doeren Mayhew had been retained to conduct a forensic accounting investigation relating to Venture's financial transactions and reporting.  Autoliv knew of the Chapter XI filing on March 28, 2003.

Subsequent filings which includes the petition for the appointment of Doeren Mayhew to conduct the forensic accounting investigation were a matter of public record. It is inconceivable that Autoliv did not monitor the Chapter XI proceedings.

- During discovery Autoliv did not seek to identify by interrogatory or to depose Venture's financial professionals, including Peter Asvestas, or examine into the $6.8 million dollar inventory adjustment of 2002 which was reflected in Venture's financial statements. Peter Asvestas' position as controller at the Grand Blanc facility was known to Autoliv.

- Levko's opinion on damages was grounded on bids that antedated December 31, 2001.

- There is no evidence to suggest that the accounting irregularities at the Grand Blanc facility described in the Doeren Mayhew report of March 25, 2004 affected Venture's 1996-2001 financial statements.

- At trial, Autoliv argued that Levko's damages analysis was divorced from plant-wide financial information and Levko did not look to actual performance.

- The adjustments to the plant-wide financial statements called for by the March 25 Doeren Mayhew report would not have resulted in any significant change in the contribution margins used by Levko.

**B.**

It cannot be said that if the jury was presented with the Doeren Mayhew reports, particularly the March 25 Doeren Mayhew report, its decision on damages would have been any different. Autoliv did not take exception to the pretrial ruling that any reference to

20

Venture's Chapter XI proceedings was irrelevant and therefore inadmissible. Autoliv knew in advance of trial of Venture's financial difficulties. Insolvency does not rise full blown like Venus from the head of Zeus. The March 10 Doeren Mayhew report disclosed not mismanagement of the financial accounts of Venture, but rather over-reaching by Venture's principal stockholders. Nothing in the report casts any doubt on the financial accounts of the Grand Blanc facility.

While the March 25 Doeren Mayhew report cast some doubt on the financial accounts of the Grand Blanc facility, it is not in a way that affects Venture's damages evidence at trial. That evidence consisted of Levko's testimony and exhibits. Levko was vigorously cross-examined at the evidentiary hearing on April 29, 2005. His conclusions held firm. Autoliv's subsequent analysis does not disclose flaws sufficient in magnitude to require the Court to find a lack of credibility in Levko's opinion.

What Autoliv has done in support of its motion is little more than recycling the arguments it put to the jury at trial. The adjustments called for by the March 25 Doeren Mayhew report simply do not cast doubt on the credibility of Venture's proofs at trial. In the end, Autoliv has not given the Court any good reason to require a new trial on damages, much less to inquire further.

For all the reasons stated above, the Court has denied Autoliv's Motion for New Trial.

                 s/Avern Cohn

Dated: August 4, 2005                     AVERN COHN
                                UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was sent to counsel of record on this date, August 4, 2005, by electronic and/or ordinary mail.

                 s/Julie Owens
                 Case Manager, (313) 234-5160